POTOMAC ELECTRIC POWER CO. v.
PUBLIC UTILITIES COMMISSION OF
DISTRICT OF COLUMBIA et al.

No. 8967.

United States Court of Appeals

District of Columbia.

Argued April 8, 1946.

Decided July 16, 1946.

Opinions Filed Nov. 18, 1946.

WILBUR K. MILLER, Associate Justice, dissenting.

———◆———

Messrs. T. Justin Moore and S. Russell Bowen, both of Washington, D. C., with whom Messrs. William K. Laws, of Washington, D. C. and George D. Gibson, of Richmond, Va., were on the brief, for Potomac Electric Power Company. Messrs. Henry Wise Kelly and Robert E. Lee Goff, both of Washington, D. C., also entered appearances for Potomac Electric Power Company.

Mr. Lloyd B. Harrison, Assistant Corporation Counsel, District of Columbia, of Washington, D. C., with whom Mr. Vernon E. West, Corporation Counsel, District of Columbia, of Washington, D. C., was on the brief, for Public Utilities Commission. Mr. Richmond B. Keech, Corporation Counsel, District of Columbia, of Washington, D. C., at the time the record was filed, also entered his appearance.

Mr. Marvin C. Taylor, of Washington, D. C., Attorney, Department of Justice, with whom Mr. Edward M. Curran, of Washington, D. C., United States Attorney at the time of argument, was on the brief, for the United States. Assistant Attorney General Shea also entered his appearance for the United States but resigned before the appeal was heard.

Mr. James W. Lauderdale, of Washington, D. C., People's Counsel, Intervenor, pro se.

Before EDGERTON, CLARK, and WILBUR K. MILLER, Associate Justices.

EDGERTON, Associate Justice.

This case and No. 8995, United States v. Public Utilities Commission of the District of Columbia, —— U.S.App.D.C. ——, 158 F.2d 533, are appeals from orders of the District Court of the United States for the District of Columbia which dismissed separate appeals of the Potomac Electric Power Company and of the United States from an order of the Public Utilities Commission of the District of Columbia entered July 22, 1944. The Commission's order[1] modified "the existing sliding scale arrangement for electric rate adjustments", directed the Company to file new rate schedules designed to reduce its gross operat-

[1] Only two Commissioners concurred. Commissioner Hankin's term of office expired before the order was issued. He had previously filed a dissenting opinion which substantially supports the position of the United States on the present appeals.

ing revenues by $1,037,189, and directed certain adjustments in depreciation reserve and in annual provision for depreciation. Both the Company and the United States appealed to the District Court, which dismissed both appeals. The Company contends that the Commission's procedure was invalid. The United States contends that the Commission's order did not sufficiently reduce the Company's rates.

On July 16, 1946, this court affirmed both orders of the District Court and stated that opinions on each appeal would be filed later. The present opinions relate to the Company's appeal.

The law creating the Public Utilities Commission[2] provides in Par. 2 that the charges of public utilities shall be "reasonable, just, and nondiscriminatory". Par. 41 directs the Commission to fix "just and reasonable" rates and charges. The statute does not undertake to provide a formula for determining what rates are just and reasonable.

Par. 18 of the law provides "That nothing in this section shall be taken to prohibit a public utility, with the consent of the commission, from providing a sliding scale of rates and dividends according to what is commonly known as the Boston sliding scale, or other financial device that may be practicable and advantageous to the parties interested. No such arrangement or device shall be lawful until it shall be found by the commission, after investigation, to be reasonable and just and not inconsistent with the purposes of this section. Such arrangement shall be under the supervision and regulation of the commission. The commission shall ascertain, determine, and order such rates, charges, and regulations, and the duration thereof, as may be necessary to give effect to such arrangement, but the right and power to make such other and further changes in rates, charges, and regulations as the commission may ascertain and determine to be necessary and reasonable, and the right to alter or amend all orders relative thereto, is reserved and vested in the commission notwithstanding any such arrangement and mutual agreement".

In order to understand the present controversy it is necessary to go back to a consent decree which the District Court entered December 31, 1924. That decree provided, among other things, that the value of the Company's property was $32,500,000 and that "If the rates hereafter yield more than a 7½ percent return on $32,500,000, plus actual cost of future additions * * *, one-half of said excess shall be used in a reduction of rates to be charged the public for electric service thereafter, thereby providing a sliding scale of rates under provisions of paragraph 18 of the Act creating the Public Utilities Commission, advantageous to the public and company alike; that is to say, by way of example, if the return for any one year should amount to $100,000 over and above 7½ percent on the base ascertained as aforesaid then the rates for the succeeding year to be charged the public shall be automatically reduced by the filing of new rate schedules to absorb $50,000 of such excess during such year".

In 1931 the theoretical basic rate of return on the rate base was reduced from 7½ percent to 7 percent. It was further reduced to 6½ percent in 1935 and to 6 percent in 1937. The order here on appeal would reduce it to 5½ percent. The Company does not contend that these basic rates (percentages) of return have been less than fair to it. No such contention could well be made. The Supreme Court in 1933 upheld the sufficiency of a 7 percent rate of return in Wabash Valley Electric Co. v. Young, 287 U.S. 488, 502, 53 S. Ct. 234, 77 L.Ed. 447, and in Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, 319, 53 S.Ct. 637, 77 L.Ed. 1180. In 1938 it upheld a 6 percent rate of return in Driscoll v. Edison Light & Power Co., 307 U.S. 104, 119, 59 S.Ct. 715, 83 L.Ed. 1134. Since the charges for electricity which the Commission has prescribed from time to time have been theoretically designed, in accordance with the consent decree, to reduce by 50 percent per year, and thereby substantially to eliminate within a short time, any excess above the prescribed basic rate of return, it is evi-

---

[2] 37 Stat. 974, § 8, D.C.Code, 1940, §§ 43—101 to 43—1007.

dent that this basic rate has been the rate of return which the Commission has decided to be fair and reasonable.

With modifications not material here, the arrangement set up by the consent decree has been in nominal effect since 1924. But, whether wholly because of persistent errors of prediction or partly because of errors of interpretation, it has never been in actual effect. Though the rates charged for electricity have been repeatedly reduced, the Company's returns have been almost continuously far higher than any possible interpretation of the consent decree required or permitted, and far higher than the reasonable basic rate of return.[3] In the first year, 1925, the Company's return was 9.59 percent of the rate base. Since this was more than the basic rate, on any interpretation of the decree the return for 1926 should have been lower. Actually the return for 1926 was 9.72 percent. It was 9.22 percent for 1927, 10.28 percent for 1928, 10.34 percent for 1929, and 10.71 percent for 1930. In every year but one from 1925 to 1943, the Company's return considerably exceeded the basic rate. In each of 7 of these years, the return exceeded the basic rate by more than $1,000,000. For the entire period of 19 years the Company's "excess earnings", as stated by the Commission, were more than $16,000,000.

No one contends that the rate base, i.e. the principal sum on which the rate af return is calculated, has been unfairly low. Since the Company's returns have greatly exceeded a fair percentage of return upon a fair base, it follows as a matter of law that the rates charged for electricity, instead of being "just and reasonable" as the law requires them to be, have been excessive. There is nothing new about this principle. Speaking for a unanimous Supreme Court, Chief Justice Taft said in 1924: "If the profit is fair, the sum of the rates is so. If the profit is excessive, the sum of the rates is so".[4]

But all this hardly begins to suggest the extent to which the Company's returns, and therefore the rates charged for electricity, have been excessive. For the rate base has been unfairly *high*. It has included not merely the proceeds of bonds, preferred stock, and common stock, but a large and increasing surplus. When a utility charges only reasonable rates, earns only reasonable returns, and accumulates a surplus by withholding some of these returns from stockholders instead of distributing them in dividends, the surplus so accumulated is in substance an investment which the stockholders have made and they are commonly entitled to a return upon it. But the case of this Company is very different. Its surplus was accumulated out of excessive returns derived from excessive rates. It has not practiced self-denial in respect to dividends. On the contrary, it has constantly distributed very large dividends. Accordingly, the surplus, which the Commission has included in the rate base, has been built up not by the Company's investors but by its customers.

In 1925 the par value of the Company's common stock was $6,000,000. The Commission has determined at various times that only $2,245,000 of this amount represented cash received by the Company and invested in plant. Recently, in 1942, an additional $3,000,000 of common stock was issued for $3,000,000 in cash, making the total par value $9,000,000 and the total common-stock investment $5,245,000. Yet the "common-stock equity" (including surplus) which the Commission has included in the rate base increased from $8,126,886 in 1925 to $35,914,645 in 1942 and $38,073,241 in 1943. Annual "income available for

---

[3] The suggestion has been made that large returns from reduced rates mean increased efficiency on the part of the Company's personnel, and that the holder of the Company's stock should profit from this supposed efficiency of its officers and employees. But nothing in the record indicates whether their efficiency has in fact increased, or even whether it is relatively high. It is notorious that the population of Washington, the varie- ty of electrical appliances, and the use of electrical appliances, have greatly increased; that scientific progress of many sorts has been made; and that all this has greatly reduced the Company's unit cost of producing and distributing electricity.

[4] Dayton-Goose Creek R. Co. v. United States, 263 U.S. 456, 483, 44 S.Ct. 169, 174, 68 L.Ed. 388, 33 A.L.R. 472.

524

common stock" increased from $2,598,289 in 1925 to $3,786,418 in 1943.[5] Throughout the period such income averaged 14.44 percent on the "common-stock equity", about 60 percent on the par value of the common stock, and about 150 percent on the common-stock investment in plant. The average annual dividend rate was about 9 percent on "common-stock equity", about 38 percent on the par value of common stock, and about 99 percent on common-stock investment. For the 19 years from 1925 to 1943, common-stock dividends averaged more than $2,300,000 a year and totalled $45,345,000.

We come now to the effect of the appealed order of the Commission. The order is designed to result in income available for common stock, after meeting all expenses, interest, depreciation, and preferred dividends, of $3,250,000 for 1944. This would be, as the Commission observes, 8.91 percent of the "common-stock equity". It would also be, as the Commission does not observe, some 36 percent of the par value of the common stock and some 60 percent of the amount which the Company received for the stock and invested in plant. The Commission says that the proposed return, in its opinion, will enable the Company "to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed". This is understatement if not irony. The risks, if any, are as small as the human mind can conceive. The return is enormous.

"If the profit is fair, the sum of the rates is so".[6] "If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end".[7] It is scarcely necessary to say that the impact of this order upon the Company produces no arbitrary result. The Company does not even question the finding of the District Court that

the rates required by the order are just and reasonable. The Company does not contend that it is entitled to earn more, or that the order will cause it to earn less, than 8.91 percent on the entire "common-stock equity", 36 percent on the par value of the common stock, and 60 percent on the common-stock investment. "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end * * * He who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences".[8]

Though the Commission held a full hearing on proper notice,[9] though Par. 62 of the statute expressly authorizes the Commission to rescind or amend any rate order, and though Par. 18 expressly vests in the Commission full authority to change rates and regulations which have been embodied in a mutual agreement regarding a sliding scale, the Company contends that the appealed order is invalid because of the manner in which it was adopted. The Company seems to argue that because a sliding scale was originally adopted with its consent, and because the appealed order does not entirely abrogate the sliding scale, the Company's consent is necessary to the validity of the order. The plain language of Par. 18 answers this argument. The Company contends, also, that a valuation of its property is necessary to the validity of the Commission's order. There are at least three answers to this contention.[10] (1) The Company does not challenge the finding of the District Court that the order will allow the

[5] In each of the years 1930, 1931, 1932, 1936, and 1937, it exceeded $4,000,000.
[6] Dayton-Goose Creek R. Co. v. United States, 263 U.S. 456, 483, 44 S.Ct. 169, 174, 68 L.Ed. 388, 33 A.L.R. 472.
[7] Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037.
[8] Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333.
[9] The notice expressly covered not only modification of "the sliding scale method" but also its abandonment; moreover the appealed order did not abandon the sliding scale but only modified it.
[10] Apart from the suggestion that the "rate base" which the Commission "finds" may be considered a valuation.

Company a fair return upon the fair value of its property. Valuation could be only a means to that end. Since the end is achieved, the Company cannot complain if a particular means was not used. (2) A valuation of the Company's property was made by the consent decree, and though the Act (Par. 7) directs the Commission to "value the property * * * at the fair value thereof at the time of said valuation", it does not direct the Commission to make a new valuation whenever rate schedules are changed. (3) The Act does not condition rate-making upon valuation. Though Congress required that a valuation be made, it may have done so either for possible use in legislation or for such use, if any, as the Commission might see fit to make of it, in regulating either rates or security issues. The Supreme Court has decided that a statutory provision for finding "fair value" does not require use of "fair value" in fixing rates. " 'Fair value' is the end product of the process of rate-making not the starting point * * *. The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated".[11]

It follows that the District Court was right in dismissing the Company's appeal.

Judge CLARK concurs in the result of the foregoing opinion, though not in the opinion. The judgment dismissing the Company's appeal is therefore affirmed.

Affirmed.

CLARK, Associate Justice (concurring in the result).

As indicated in Judge EDGERTON's opinion, I arrive at the same result as to the appeal of the Potomac Electric Power Company, but by a different route. I therefore concur in Judge EDGERTON'S conclusion and in his judgment on this appeal but not in his opinion for the reasons hereinafter stated which express my own view of the case.

This appeal, No. 8967, is one of two appeals from an Order of the Public Utilities Commission of the District of Columbia. The Public Utilities Commission order was issued July 22, 1944, and is designated as Order No. 2796.

Order No. 2796 directed the Potomac Electric Power Company to file new rate schedules aimed at reducing the Company's gross operating revenues by $1,037,189 per year. In arriving at this determination the Commission made certain adjustments in the depreciation reserve and in the provisions for calculating annual depreciation.

From this order both the Potomac Electric Power Company and the United States, represented by two governmental agencies suing in their capacity as consumers, have appealed. The appeals were heard together but this Court has decided to treat them sep-

[11] Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 601, 64 S.Ct. 281, 88 L.Ed. 333. Section 6 of the Natural Gas Act, 52 Stat. 821, 824, 15 U.S.C.A. § 717e, provides that "The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property". In the statute we are interpreting, unlike the Natural Gas Act, references to cost and value are not linked with rate-making. It is true that Par. 7 of our statute provides that the Commission "shall" value the property. But "shall value the property" does not mean "shall use value in fixing rates".

While Par. 7 requires the Commission to make a valuation, Par. 6 requires the Commission to determine "the amount of money expended * * * the amount of money it would require to secure the right of way, reconstruct * * * and to replace all the physical properties belonging to the public utility * * * the outstanding stock, bonds, debentures, and indebtedness". Nothing is said in either paragraph, or elsewhere in the Act, as to whether any of these matters must be adopted as a rate base. If any must, all must. That would be impossible and therefore cannot have been intended.

Potomac Electric Power Co. v. Public Utilities Commission of District of Columbia, 51 App.D.C. 77, 276 F. 327, appeal dismissed, Keller v. Potomac Electric Power Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731, is no longer law.

arately. Therefore this opinion deals only with Case No. 8967, the appeal of the Potomac Electric Power Company. The appeal of the United States, No. 8995, ——. U.S. App.D.C. ——, 158 F.2d 533, will be dealt with in a separate opinion.

The Potomac Electric Power Company urges that Order No. 2796 cannot be sustained on the basis of the sliding scale agreement, that it is void without regard to any other section of the Act and cannot be upheld under the general regulatory powers of the Commission.

Paragraph 18 of the Act [1] provides that the Public Utility "With the consent of the commission" may provide a "sliding scale" of rates and dividends along the pattern commonly recognized as the Boston Sliding Scale. It is the Company's position that this provision of the law requires an absolute mutuality. In other words, the Company contends that since it does not agree with the result reached by the Commission and since the Commission says in its order that the principle of the "sliding-scale" is to be preserved,[2] the order is not binding if its terms be rejected by the Company.

To analyze this contention we must look not only to the terms of paragraph 18, but also to the nature of the hearing notice and the hearing which resulted in this order. I believe that if we were to accept the Company's argument as to the nature and effect of paragraph 18, it would amount to giving the Company an unwarranted right of veto over any rate order predicated on a "sliding-scale" principle. It seems to me that such a result is patently against the general policy of public utility regulation and clearly against the obvious intent of Congress in passing this provision. The provision itself includes this passage: "The commission shall ascertain, determine, and order such rates, charges, and regulations, and the duration thereof, as may be necessary to give effect to such arrangement, but the right and power to make such other and further changes in rates, charges, and regulations as the commission may ascertain and determine to be necessary and reasonable, and the right to alter or amend all orders relative thereto, is reserved and vested in the commission notwithstanding any such arrangement and mutual agreement."

It is my view that the terms of this paragraph were designed to permit the Utility to affirmatively propose a "sliding-scale" arrangement, but it seems clear that there was no intention to divest the Public Utilities Commission of its power to also propose, if it thinks advisable, a pattern of regulation predicated on the "sliding-scale" —or to override the Company's own plan by such further regulations, under its general powers, as the Commission deems necessary.

It would indeed be an anomaly to permit the Power Company to frustrate the regulatory body by withdrawing at will from any arrangement which it, the Company, considered valid only when mutually ac-

---

[1] 37 Stat. 980, D.C.Code, 1940, 43—317, reading: "That nothing in this section shall be taken to prohibit a public utility, with the consent of the commission, from providing a sliding scale of rates and dividends according to what is commonly known as the Boston sliding scale, or other financial device that may be practicable and advantageous to the parties interested. No such arrangement or device shall be lawful until it shall be found by the commission, after investigation, to be reasonable and just and not inconsistent with the purposes of this section. Such arrangement shall be under the supervision and regulation of the commission. The commission shall ascertain, determine, and order such rates, charges, and regulations, and the duration thereof, as may be necessary to give effect to such arrangement, but the right and power to make such other and further changes in rates, charges, and regulations as the commission may ascertain and determine to be necessary and reasonable, and the right to alter or amend all orders relative thereto, is reserved and vested in the commission notwithstanding any such arrangement and mutual agreement."

[2] The Commission reached two basic conclusions in this regard:

"1. The sliding scale principle of electric rate determination is advantageous to the public and to the utility, and it should be preserved.

"2. The sliding-scale arrangement as presently constituted, in the light of existing conditions, requires substantial modification."

ceptable. I think, taking the Pepco argument in its most favorable light, that the time for withdrawal from the "sliding-scale" arrangement has long since past so far as concerns the now challenged order. Looking to the notice of hearing we observe that it called for a complete re-examination of the components of the "sliding-scale" as it then existed and for a hearing on the advisability of continuing any sort of sliding scale plan.[3] Under this notice the Company came forward for a hearing which it knew might well terminate the sliding scale arrangement. By the same token I think the hearing notice was broad enough to place the Company and any interested intervenors on notice that an evaluation proceedings might be a part of the hearing.

For purposes of my opinion as regards the Pepco appeal, I am prepared to say that even if the Company at this late hour has, by the terms of paragraph 18, reserved to it the right to withdraw from any plan which exists by reason of "mutual agreement", it cannot prevail for the simple reason that the Commission's general powers are quite sufficient as the basis of this challenged order. There is nothing in the general regulatory powers of the Commission to preclude its adopting a "sliding scale" plan. Thus if we are to consider Order No. 2796 as a departure from the mutually

agreeable "sliding scale" we must examine it, in terms of limitations, only from the standpoint of the general regulatory provisions of the Act.[4] Paragraph 2 of the Commission's organic statute provides: "That every public utility doing business within the District of Columbia is required to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable. The charge made by any such public utility for any facility or services furnished or rendered, or to be furnished or rendered, shall be reasonable, just, and non-discriminatory. Every unjust or unreasonable or discriminatory charge for such facility or service is prohibited and is hereby declared unlawful. Every public utility is hereby required to obey the lawful orders of the commission created by this section."

This is the fountain head of the Commission's authority and the policy to guide its actions.[5]

The Company hinges its objection to supporting the order under the general powers of the Commission on the valuation requirement of the statute. It is the Company's argument that the Commission did not value the property at the time of issuing the order.

The Company urges that the provisions of paragraphs 6–8 of the Act [6] look to "cur-

---

[3] By Order No. 2565, dated April 26, 1943, the Commission made it quite clear that it was going into an investigation to determine the following:

"1. Whether the sliding-scale method of electric rate regulation shall be abandoned. 2. Whether the sliding-scale method of electric rate regulation shall be continued in its present form or with modifications of the basic elements of the existing arrangement. 3. Without limiting the scope of the investigation, what modifications, if any, shall be made in the following basic elements of the present sliding-scale arrangement: (a) The rate base. (b) Rate of return. (c) Depreciation accruals. (d) Method of effecting rate reductions."

[4] 37 Stat. 974, D.C.Code, 1940, 43—101 to 43—1007.

[5] Paragraphs 38, 39, 40, and 41 provide that the Commission may, upon its "own initiative", hold hearings, conduct investigations and establish by order "just and reasonable" rates and charges.

[6] 37 Stat. 978, D.C.Code, 1940, 43—305 to 43—307. "Par. 6. That the commission shall ascertain, as soon and as nearly as practicable, the amount of money expended in the construction and equipment of every public utility, including the amount of money expended to procure any right of way; also the amount of money it would require to secure the right of way, reconstruct any roadbed, track, depots, cars, conduits, subways, poles, wires, switchboards, exchanges, offices, works, storage plants, power plants, machinery, and any other property or instrument not included in the foregoing enumeration used in or useful to the business of such public utility, and to replace all the physical properties belonging to the public utility. It shall ascertain the outstanding stock, bonds, debentures, and indebtedness, and the amount, respectively, thereof, the date when issued, to whom issued, to whom sold, the price paid in cash, property, or labor therefor, what disposition

rent fair value" and require a determination "in the light of current cost to reproduce, among other factors". I cannot support the Company's contention. As is pointed out by the Commission, paragraph 6 does not mention the words "fair value", "value" or "rate base", nor does it indicate that the information collected in accordance with this paragraph shall be employed for the purpose of setting rates. Paragraph 7 does direct the Commission to "value the property of every public utility within the District of Columbia * * * at the fair value thereof at the time of said valuation." Paragraph 8 requires notice to the utility and public hearing before final determination on the matter of valuation. However, I fail to see how, taking all three paragraphs together, there can be worked out a valid argument along the lines advanced by the Company. Pepco would have us hold as matter of law that these provisions write into statute a rigid formula for rate determination under the standards of the holding in Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819.[7] In my view there are two grounds rejecting the company's argument that the Commission has not adhered to the statutory dictates in this matter of valuation. First, a valuation was made under the consent decree of 1924. Presumably, since no objection was raised, that valuation was considered to be proper at that time. There is nothing in the Act which would, in my opinion, preclude the carrying forward of that valuation, under an accounting pattern providing for accessions; and there is nothing in the Act to direct the Commission to make a new "valuation" whenever an amendatory regulation was promulgated under the "sliding-scale" plan. Quite apart from this consideration, we have the question of the nature and purpose of the hearing which resulted in Order No. 2796. It was not only broad enough to cover a valuation proceeding, but the Commission did in fact take valuation evidence into account. Both the Commission and the United States presented valuation data, and the Company cannot be heard to say that it did not know that it too could come forward with such evidence as it deemed pertinent in this regard. If it was not satisfied with the evidence presented to the Commission it had the burden of making out its own case. This the Company failed to do, and in my opinion the Commission was properly with-

---

was made of the proceeds, by whom the the indebtedness is held, so far as ascertainable, the amount purporting to be due thereon, the floating indebtedness of the public utility, the credits due the public utility, other property on hand belonging to it, the judicial or other sales of said public utility, its property or franchises, and the amount purporting to have been paid, and in what manner paid therefor, and the taxes paid thereon. The commission shall also ascertain in detail the gross and net income of the public utility from all sources, the amounts paid for salaries to officers and the wages paid to its employees, and the maximum hours of continuous service required of each class. Whenever the information required by this paragraph is obtained it shall be printed in the annual report of the commission. In making such investigation the commission may avail itself of any information in possession of any department of the Government of the United States or of the Commissioners of the District of Columbia.

"Par. 7. That the commission shall value the property of every public utility within the District of Columbia actually used and useful for the convenience of the public at the fair value thereof at the time of said valuation.

"Par. 8. That before final determination of such value the commission shall, after notice of not less than thirty days to the public utility, hold a public hearing as to such valuation in the manner hereinafter provided for a hearing, which provisions, so far as applicable, shall apply to such hearing. The commission shall, within ten days after such valuation is determined, serve a statement thereof upon the public utility interested, and shall file a like statement with the District Committees in Congress.

[7] The Company's argument in this regard is greatly weakened by the fact that the elements enumerated in paragraph 6 do not match up in any more than chance fashion with those which from time to time have been classed as proper elements under the Smyth v. Ames doctrine. Cf. the elements in Puget Sound Power & Light Co. v. Federal Power Commission, 78 U.S.App.D.C. 143, 137 F.2d 701; Alabama Power Co. v. Federal Power Commission, 75 U.S.App. D.C. 315, 128 F.2d 280, certiorari denied, 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 525.

in the requirements of the law in making such adjustments as it did and establishing the so-called "new" valuation on the basis of the best evidence before it on the date stated, December 31, 1943.

It seems to me particularly important to look to the substantive result of the Commission's order so far as concerns Pepco. When this is done it is clear that the Company has no legitimate complaint about the order here in issue. Its objection to the procedural techniques in reaching the order are important and valid only if it be shown that by erroneous procedure the company lost substantial rights which the law guarantees to it or that the Commission had violated the dictates of the statute and thus produced an arbitrary or capricious order. Such is not the case here. Therefore, so far as concerns the Potomac Electric Power Company the dismissal of appeal by the District Court is affirmed.

I therefore concur with Judge EDGERTON in the result reached in Case 8967.

WILBUR K. MILLER, Associate Justice (dissenting).

In my opinion, the sliding scale rate arrangement permitted by paragraph 18 of the utility regulatory act here involved must be one which is entered into voluntarily by the utility, and alterations in it may not be made by the Commission without the utility's consent, and certainly not over its protest. It is my view also that the District of Columbia regulatory act differs basically from the Natural Gas Act, in that its paragraphs 6 and 7 prescribe standards for the Commission to follow in the rate-making process which are not contained in the Natural Gas Act; consequently, the Natural Gas Pipeline and Hope cases [1] do not control here. I think that the action of the Commission complained of in this case constituted a departure from the sliding scale arrangement to which the utility had agreed and that when the company refused to acquiesce and withdrew from the agreement theretofore existing concerning a sliding scale scheme, the power of the Commission under paragraph 18 ceased; that the Commission then was relegated to its general rate-making power under the Act, in the exercise of which it is bound to observe the dictates of paragraphs 6 and 7 of the statute. Consequently I cannot concur in the decision of the majority.

To test the correctness of the Court's opinion in this case, it is necessary first to examine and understand paragraph 18 of the District statute.[2] While that paragraph could have been framed so as to eliminate the difficulty of interpretation which is illustrated in the present case, I have no doubt as to its true meaning. In its inception, the paragraph is to the effect that a public utility shall not be prohibited from providing, with the consent of the Commission, a sliding scale of rates. The second sentence, "No such arrangement or device shall be lawful until it shall be found by the commission, after investigation, to be reasonable and just and not inconsistent with the purposes of this section," means nothing except that the Commission shall not blindly accept a sliding scale rate proposal made by a utility, but that the Commission must investigate and must de-

[1] Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

[2] "Par. 18. That nothing in this section shall be taken to prohibit a public utility, with the consent of the commission, from providing a sliding scale of rates and dividends according to what is commonly known as the Boston sliding scale, or other financial device that may be practicable and advantageous to the parties interested. No such arrangement or device shall be lawful until it shall be found by the commission, after investigation, to be reasonable and just and not inconsistent with the purposes of this section. Such arrangement shall be under the supervision and regulation of the commission. The commission shall ascertain, determine, and order such rates, charges, and regulations, and the duration thereof, as may be necessary to give effect to such arrangement, but the right and power to make such other and further changes in rates, charges, and regulations as the commission may ascertain and determine to be necessary and reasonable, and the right to alter or amend all orders relative thereto, is reserved and vested in the commission notwithstanding any such arrangement and mutual agreement."

cide that the suggested arrangement is reasonable and just, and consistent with the general purposes of the Act, before it can enter into the agreement offered. The purposes of the Act are found in paragraph 2 and, simply stated, are that every public utility must furnish reasonably safe and adequate service and facilities at reasonable, just and nondiscriminatory charges. After having satisfied itself that the sliding scale rate proposed will not result in unreasonable, unjust or discriminatory charges, the Commission is authorized to accept the suggested sliding scale.

The next sentence of paragraph 18, "Such arrangement shall be under the supervision and regulation of the commission," means nothing more than that the sliding scale arrangement, after having been agreed upon by the utility and the commission, shall be supervised and regulated by the Commission in order to insure observance of it according to its terms.

Continuing a sentence-to-sentence analysis of the paragraph, we come to this language, "The commission shall ascertain, determine, and order such rates, charges, and regulations, and the duration thereof, as may be necessary to give effect to such arrangement, * * *." To my mind this simply means that the Commission shall promulgate official rates to give effect to the contractual scheme; not at all does it mean that, under the guise of proceeding pursuant to the agreement, the Commission may order other rates and institute other regulations which will completely change the arrangement, instead of giving effect to it.

The sentence continues, "* * * but the right and power to make such other and further changes in rates, charges, and regulations as the commission may ascertain and determine to be necessary and reasonable, and the right to alter or amend all orders relative thereto, is reserved and vested in the commission notwithstanding any such arrangement and mutual agreement." I have no doubt that the part of the sentence just quoted has caused the majority to conclude that, once a sliding scale rate proposed by a utility has been accepted by the Commission, the utility thereby has surrendered all its rights under the general

rate provisions of the statute and has given carte blanche to the Commission thereafter to depart from the agreement and to substitute a different rate arrangement, without regard to the rest of the statute and without observing any procedure or following any standard set forth in the Act with respect to the method of establishing rates when there is no agreed device under paragraph 18.

If that were the proper meaning of the words last quoted above, no utility managed by sane men would ever venture into such a sliding scale arrangement; for the management would know that, having done so, the utility would be completely at the mercy of the Commission, no matter how arbitrary its orders might be. It is my view that, in its rational meaning, the latter part of the last sentence of paragraph 18 reserves to the Commission the right to withdraw from the agreed arrangement whenever it shall find and determine that the scheme is no longer reasonable and just. In fact, the closing words of the paragraph, "notwithstanding any such arrangement and mutual agreement," in my view emphasize that mutuality is essential to the continuance of the sliding scale.

It should be carefully noted that in the sentence there is reserved the power to make "other and further changes in rates * * * notwithstanding any such arrangement and mutual agreement." Had the Congress intended this to be a grant of power to only one of the parties unilaterally to make changes in what had been a mutual agreement, it would have been apt to say there is reserved to the Commission "the right and power to make such other and further changes in the arrangement as the Commission may determine to be necessary and reasonable." In addition, words like these probably would have been added: "without regard to paragraphs 6 and 7 of this section," had the Congress intended to authorize action such as was taken in this case.

But instead, the legislators granted the Commission the power to change the agreed rates "notwithstanding any such arrangement and mutual agreement." Webster defines "notwithstanding" as "without prevention or obstruction from or by; in spite

of." He adds that the word "implies the presence of an obstacle." Clearly, then, the statutory words mean to reserve to the Commission the right to change rates in spite of a previous mutual agreement, and without prevention or obstruction from or by it. That can only mean that the right is reserved to change rates outside the mutual agreement, not within it. When one party changes a mutual agreement it is no longer mutual.

With the sliding scale permitted by paragraph 18 thus disclosed to be dependent for its validity upon the mutual consent of the utility and the Commission, let us see how this trouble started. On April 26, 1943, the Commission entered an order, the pertinent portion of which is as follows

"It is ordered: That an investigation be made to determine:

"1. Whether the Sliding-Scale method of electric rate regulation shall be abandoned.

"2. Whether the Sliding-Scale method of rate regulation shall be continued in its present form or with modifications of the basic elements of the existing arrangement.

"3. Without limiting the scope of the investigation, what modifications, if any, shall be made in the following basic elements of the present Sliding-Scale arrangement.

"(a) The Rate Base.

(b) Rate of Return.

(c) Depreciation Accruals.

(d) Method of effecting rate reductions."

Thus it will be seen that the Commission wanted to inform itself so as to decide whether it should withdraw from the agreement concerning the sliding-scale method of rate-making regulation, whether that method should be continued as theretofore, or whether it should be continued with modifications of its basic elements. It will be observed that the Commission wanted to ascertain whether modification should be made in the basic arrangements of (a) The Rate Base, (b) Rate of Return, (c) Depreciation Accruals, and (d) Method of effecting rate reductions.

This was proper procedure under paragraph 18 and particularly the last clause of its closing sentence. For, if after investigation, the Commission should decide that the sliding-scale method of rate-making regulation should be abandoned, well and good. It could then withdraw from the agreement. If it should decide that the sliding scale method of rate-making regulation should be continued in its present form, well and good. It could be so continued unless the company should withdraw. But if, after its investigation, the Commission should decide that the sliding scale arrangement should be modified as to the rate base, the rate of return, the depreciation accruals or the method of effecting rate reductions, then it could do nothing more than suggest to the utility its desires in those respects, and see if the utility would be willing to continue the agreed sliding scale after such modifications. If it could then impose its will on the utility, without the latter's consent and over the latter's protest, the mutuality which is the very basis of the rate regulation permitted by paragraph 18 would be destroyed.

The only way, in my opinion, that the Commission could impose upon the utility a rate base, a rate of return, a treatment of depreciation or a method of reducing rates other than those contained in the arrangement originally proposed and agreed to by the company, as modified from year to year through subsequent agreements, would be to enter upon a general investigation for the purpose of establishing new rates. In that undertaking, paragraph 18 would no longer have significance and it would be the duty of the Commission to pursue the method and to observe the standards, if any, contained in those portions of the Act, other than paragraph 18, which have to do with the general power of the Commission to establish rates.

Pursuant to the order of April 26, 1943, the Commission proceeded with its investigation. Its conclusion was that the rate base should be reduced by $24,700,000; that the rate of return should be reduced from 6 per cent to 5½ per cent; that the method of depreciating the property should be substantially changed; and that the rate adjustment should be altered so that the annual reduction of one half of the "excess income" should be from net income instead

of from gross revenue. The sliding scale arrangement so proposed by the Commission bore little resemblance to that which had existed theretofore and to which the company had agreed. The utility refused to accept it, and withdrew from the agreement under paragraph 18, as I think it had a right to do. If I am correct in thinking that no rate regulatory scheme to which the affected utility has not agreed can be valid under paragraph 18, then certainly the Commission's order complained of here, which set up a plan radically different from that to which the company had assented, can have no validity under that paragraph of the statute.

It follows that the order appealed from in this case is wholly invalid, unless it can stand as a rate order formulated under the general rate-making power conferred on the Commission by the District statute. Not having been reached under the process permitted by paragraph 18, the order is void unless it was arrived at through the procedure and according to the standards prescribed by the remainder of the statute.

In establishing rates under its general power, in the absence of an agreed sliding scale, what must the Commission do? Paragraph 6 of the Act requires it to ascertain original cost and reconstruction cost, as well as other data. This was not done. Paragraph 7 provides that "the commission shall value the property * * * at the fair value thereof at the time of said valuation." There was no pretense of compliance with this mandate which contains the imperative "shall."

How, then, can the Commission's order be regarded as valid by my brothers of the majority? By the simple expedient of saying paragraphs 6 and 7 have nothing to do with rate-making. It is suggested that the data assembled as required by those paragraphs would be otherwise useful to the Commission, and of interest to the Congress when submitted to it in the Commission's annual report.

The idea that the fair value valuation required by paragraph 7 was not intended to be used as a rate base is contrary to our decisions. In Public Utilities Commission of the District of Columbia v. Capital Traction Co.,[3] this Court said: "It must be remembered, moreover, that the present valuation is not intended as a buying and selling price of the property, but for *rate-making purposes.*" (Emphasis supplied.) Our opinion in Washington Gas Light Co. v. Byrnes [4] describes paragraph 7 of the Act (§ 306, Title 43, District Code) as the "governing statute" concerning the establishment of a rate base. In that opinion it clearly appears that this Court then considered the valuation contemplated by paragraph 7 as an important step in rate-making, and not merely the assembling of comprehensive data for some vague and fanciful purpose.[5]

But in spite of what seems to be the apparent and logical meaning of paragraphs 6 and 7, and in spite of the prior pronouncements of this Court to which reference has just been made, the majority of the Court feel themselves bound in this case by the Natural Gas Pipeline and Hope cases. I suggest that they misconstrue those cases. The majority seem to conclude that the Supreme Court has announced a new principle of regulatory law: that the only test which can be applied to any rate order is to examine its result; if that be not confiscatory, then the rates are reasonable and just. The Supreme Court did hold, in the two cases cited, that the end-result of the rates shows whether they are reasonable

---

[3] 57 App.D.C. 85, 17 F.2d 673, 676.
[4] 78 U.S.App.D.C. 107, 137 F.2d 547, 558.
[5] In the Byrnes opinion this sentence occurs, "In furtherance of this object the Price Administrator requested that the Commission undertake a revaluation of the Company's rate base by applying a method that is in conflict with the provisions of section 43—306 of the District Code wherein it is provided that the Commission shall value the property of every public utility in the District at the fair value thereof at the time of the valuation. In that case the Price Administrator was insisting that original cost be ascertained by a general rate investigation and that it be used as the rate base. The opinion characterized the proposal as "an investigation upon lines contrary to the governing statute." The "governing statute" is that which requires fair value to be ascertained at the time of valuation.

and just. But those cases arose under the Natural Gas Act, which contains no standards except that rates be just and reasonable. There is in that Act no equivalent of paragraphs 6 and 7 of the District statute here under consideration. It does not require the Commission to proceed in any particular manner in determining rates; it contains no mandate as to how a rate base shall be established. Under the Natural Gas Act, as interpreted by the Supreme Court, the Commission may proceed in any manner it may choose—it may even determine rates by lot or guess—so long as the effect of the rates so established cannot be said to be unjust and unreasonable.

But here we deal with a different regulatory statute which, as this Court has said heretofore, directs the Commission how to proceed. In the presence of definite, specific statutory standards, the principle of the Natural Gas Pipeline and Hope cases does not apply, and any commission action which does not observe those standards is invalid if it harms, even if it does not confiscate.

The majority say, however, in the Court's opinion in this case that the utility cannot complain because it does not show the rates established without observing the statutory procedure to be confiscatory in effect. I would agree, if this case had arisen under the Natural Gas Act or some other statute containing no standards except that the end result be reasonable and just. But when a Commission proceeds in defiance of its governing statute, its action amounts to unauthorized regulation. Unauthorized regulation is unlawful, if the utility is deprived of its property, even though the deprivation is short of confiscation. The late Chief Justice Stone, in his dissent in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 625,

65 S.Ct. 829, 849, 89 L.Ed. 1206, clearly recognized and stated the distinction between the true holding of the Hope case and the universal application of its doctrine to all situations, regardless of the presence in governing statutes of standards which are absent from the Natural Gas Act, which is contended for by the appellees and sustained by the Court's opinion in this case.[6]

By what I think was an action wholly unauthorized by the District statute and in fact in violation of its terms, the appellant has been subjected to a substantial rate reduction. I cannot agree to what seems to me to be a grossly erroneous conception of the regulatory act and an equally erroneous idea of the Supreme Court's decisions in the Natural Gas Pipeline and Hope cases.

[6] In the Colorado Interstate Gas Co. case, the late Chief Justice said

"Authorized utility regulation may, of course, result in a permissible diminution of property values and income, provided the regulation does not so exceed constitutional limitations as to be 'confiscatory'. Hence, loss or damage caused by authorized utility regulation gives rise to no actionable wrong if the regulation is within constitutional limitations. Such

was the principle laid down in the Hope case.

"But any such diminution in value or return, caused by unauthorized regulation, is unlawful without reference to constitutional principles. * * *. So far as the unauthorized regulation deprives petitioner of its property, the deprivation cannot be justified by saying that, if authorized, it would not violate the Constitution."