## UNITED STATES v. PUBLIC UTILITIES COMMISSION OF DISTRICT OF COLUMBIA et al.

### No. 8995.

United States Court of Appeals District of Columbia.

Argued April 8, 1946.

Decided July 16, 1946.

Opinions Filed Nov. 18, 1946.

---

EDGERTON, Associate Justice, dissenting.

See, also, 80 U.S.App.D.C. 227, 151 F.2d 609.

Mr. Marvin C. Taylor, Attorney, Department of Justice, of Washington, D. C., with whom Mr. Edward M. Curran, United States Attorney, of Washington, D. C., at the time of argument, was on the brief, for the United States. Assistant Attorney General Shea also entered his appearance for the United States but resigned before the appeal was heard.

Mr. Lloyd B. Harrison, Assistant Corporation Counsel, District of Columbia, of Washington, D. C., with whom Mr. Vernon E. West, Corporation Counsel, District of Columbia, of Washington, D. C., was on the brief, for Public Utilities Commission. Mr. Richmond B. Keech, Corporation Counsel, District of Columbia, of Washington, D. C., at the time the record was filed, also entered his appearance.

Messrs. T. Justin Moore and S. Russell Bowen, both of Washington, D. C., with whom Messrs. William K. Laws, of Wash-

ington, D. C., and George D. Gibson, of Richmond, Va., were on the brief, for Potomac Electric Power Company. Messrs. Henry Wise Kelly and Robert E. Lee Goff, both of Washington, D. C., also entered appearances for Potomac Electric Power Company.

Mr. James W. Lauderdale, of Washington, D. C., People's Counsel, Intervenor, pro se.

Before EDGERTON, CLARK, and WILBUR K. MILLER, Associate Justices.

CLARK, Associate Justice.

This appeal, No. 8995, is one of two appeals from an order of the Public Utilities Commission of the District of Columbia. The facts are to be found in the opinion in the companion case No. 8967, Potomac Electric Power Company v. Public Utilities Commission of the District of Columbia, — U.S.App. D.C. —, 158 F.2d 521. In its appeal the United States through two agencies suing in their capacity as consumers contends that the Commission's order permits some $29,000,000 of surplus to remain as an element in the rate base. These agencies using the name of the United States contend that this reserve was extracted from the power consumers under "illegal rates" prevailing in accordance with the operation of a "sliding-scale plan" which emerged from a consent decree effected in 1924.[1]

The United States, as a consumer, makes a most ingenious and interesting argument which tends to cast considerable reflection on the Public Utilities Commission in the matter of its responsibilities for protecting power consumers from unnecessarily high rates. However, we are unable to agree with the United States and with Judge EDGERTON, that the Commission's order is invalid, as a matter of law, for the reason that it permits some $29,000,000 of "surplus" to remain as an element in the rate base.

It is urged that the entire arrangement of the sliding scale for the period in which it has been in operation permitted the Company to earn an exorbitant, and "unlawful" profit at the expense of the consumers. In the first place we note that as a practical matter the arrangement did result in a steady and substantial reduction in the cost of electric power. The permissible rate of return to the Company was reduced over a period of years in accordance with the general decline of interest rates and each year one-half of the excess earnings were set up as the basis for reducing consumer's price schedules.

■ It is of course true that the Company collected a sizable surplus during the years in which the sliding-scale was operative but we cannot agree that the Commission acted "unlawfully" during all of these years. We note for example that returns of 7½% and 7% were approved by the Supreme Court[2] and for all we know those returns, in relation to the common stock equity, were as large or perhaps larger than those enjoyed by Pepco over the past several years. It seems to us that this court would be undertaking a wrongful invasion of the regulatory territory properly reserved for the Public Utilities Commission if we were to say, as Judge EDGERTON believes proper, that a high return on the common stock equity is, in and of itself, ample reason for retrospectively holding invalid rate schedules authorized by the Commission over a course of many years. It is only by saying retroactively, that the rates extracted in former years were not "just and reasonable", that we can conclude that the "surplus" of undistributed earnings was an unlawful accumulation which could not be devoted to the public service in such a fashion as to warrant allowing the Company to earn a return on it.

■ So far as concerns the appeal of the United States, it seems to us that the question is limited to whether the order,

---

[1] The United States had its right to appeal in the capacity of a consumer upheld in this court. United States v. Public Utilities Commission, 80 U.S.App.D.C. 227, 151 F.2d 609.

[2] See, for example, Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182; Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 46 S.Ct. 363, 70 L. Ed. 808.

as it affects the consumer, is (a) arbitrary or capricious, or (b) invalid as establishing rates that are unjust or unreasonable. On the record before us we cannot conclude that we are justified in upsetting the Commission's Order. In its argument to this court the United States is careful to point out, in urging the dismissal of Pepco's appeal, that Order 2796, "and the ordered reduction in rates, were amply justified by the Commission's basic findings of fact." The attack of the United States is launched squarely at what it terms "error of law".[3] We do not believe that the United States discharged the burden of showing an error of law on the part of the Commission.[4] Proof of high profits may be adequate to show that the Commission has not been as vigilant as it might have been in driving down the Company's rates, but we do not think that it establishes an "error of law" requiring judicial remedy, if the rates charged can properly be termed "just and reasonable". There is no question but that the Company's rates outran the Commission's efforts to cut them down under the "sliding-scale" as it has operated for the past several years. Likewise, we may well take the view that the Commission, as a matter of working policy, should have cut more deeply with its adjustments in the "allowable rate of return". The Commission may justly be charged with being conspicuously unaware of a steady trend of economic forces which converged to augment power consumption in this locality and reduce unit costs to the Company, without regard for any factors of efficient management. But all of this justifiable criticism represents nothing more, in our opinion, than an attack on an "error in judgment" by the regulatory body.[5] Such an error does not rise to the level of an error of law.

The process of public utility regulation is fraught with sundry technical accounting, engineering, and financial policy considerations, that have been properly entrusted to the regulatory bodies, and if there is produced " * * * no arbitrary result, our inquiry is at an end".[6] It does not follow from the fact of high profits that there are not low or "just" rates. These two factors existing together would appear to be a happy consequence of high production demanded by ever increasing consumption. In the instant case it appears that the power consumers in this locality enjoy rate schedules that compare very favorably with those prevailing in other major cities. This, of course, is not an argument to show that the rates should not be still lower, but it does go to establish that high profits and just rates are not prima facie incompatible.

Looking more closely at the "profits" aspect of this case, we observe that the argument of the United States depends for its cogency upon the relationship of the earnings to the common stock equity, to the par value of the common stock, and to the amount which the Company actually received for this stock and invested in plant and facilities devoted to the public service. The "percentage" profit figures arrived at by such an analysis are indeed impressive in the direction of showing that the owners of the common stock have been doing extremely well. However, this analysis provides but one of the types of information which the Commission must take into account in arriving at a "reasonable" rate. These earnings, in percentages, are meaningful only when they are related to the Company's total capital structure. This is a task for the Commission, and we do not think that this court should impose

---

[3] It is urged that the sliding scale arrangement "was unlawful in its inception, and has always been unlawful in its administration."

[4] See Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267; Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182.

[5] Note Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333, where the Court said, " * * * He who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

[6] Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037.

its judgment to the effect that these earnings be declared "unlawful", unless it clearly be shown that the rates which gave rise to the earnings are invalid because they woefully neglected the interests of the consumers.

■ The United States urges strongly that the facilities acquired by plowing back into the Company the "surplus" which accumulated over the years under the sliding-scale arrangement, and was not paid out to the stockholders, are not a legitimate element in the rate base. We are not directed to any authority for the government's position, and we have not been able to find any. On the contrary, there is a clear line of authority holding that surplus devoted to the Company's business is properly to be considered a part of the "invested capital".[7]

Inherent in the argument of the United States is the suggestion that the Company should continually finance expansions with bond issues or preferred stock. In September of 1940 the Securities and Exchange Commission had this to say about such a policy: "In fact, recent expansion and improvements have been made almost entirely through the incurrence of debt and the use of depreciation accruals, the company having paid out in common stock dividends during the years 1938 and 1939 more than the earnings available during those years for the payment of such dividends. Generally speaking * * * this practice is open to serious question as to financial soundness".[8]

■ The United States urges as an additional item of error that the District Court should have ruled that the Commission was obliged to admit in evidence an exhibit entitled "number 74". This exhibit is said to have contained information purporting to show that the holding company owners of Pepco common stock were engaged in a conspiracy to violate the District of Columbia "Anti-Merger" law. We think the Commission was justified in refusing to take into account the collateral issues posed by the tendered exhibit. It does not appear to us that the data offered was essential to the development of the "substantial" facts necessary as a foundation for promulgating the rate order.[9]

■ The foundation upon which all the argument of the United States rests is its contention that, throughout the many years during which the sliding scale arrangement has been in effect, the rates have been excessive and illegal. Each year, however, the rates were fixed by an order of the Commission. The Act[10] permits any person affected by a final order of the Commission to appeal to the District Court for a review, such action to be taken within sixty days after the Commission's denial of his application for reconsideration. The annual orders which fixed the rates became final and conclusive when no person affected thereby availed himself of the right of appeal. Consequently the rates so fixed became the legal rates for the periods during which they were to endure, and neither the United States nor any other party

[7] See Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 32, 46 S.Ct. 363, 70 L.Ed. 808; Eisner v. Macomber, 252 U.S. 189, 209, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570; Gibbons v. Mahon, 136 U.S. 549, 10 S.Ct. 1057, 34 L.Ed. 525; Geo. Feick & Sons Co. v. Blair, 58 App.D.C. 168, 26 F.2d 540; Flynn v. Haas Bros., 9 Cir., 20 F.2d 510; Eaton v. English & Mersick Co., 2 Cir., 7 F.2d 54. Cf. Railroad Commission of Louisiana v. Cumberland Telephone & Telegraph Co., 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577, where the specific point at issue here is reserved.

[8] Securities and Exchange Commission Decisions & Reports, Vol. 8, pgs. 30, 36.

[9] It is to be observed that while the United States entered this proceeding as a "consumer", it did not present an entirely solid front. Representatives of the Treasury Department and of the Federal Works Agency were not in agreement on several items, and the Commission was entitled to take the varying evidence for such use as it might make of it. We note also that in argument before this Court, counsel for the Government did not specify how much of the $29,000,000 "surplus" should be trimmed from the rate base. Hence, if we were to hold that it was not a proper element it would become our duty to specify, in dollars and cents, the amount to be taken out. This, we think, would be clearest sort of usurpation of the Commission's authority.

[10] Paragraph 65 (D.C.Code 43-705).

affected thereby can brand them as illegal. All the arguments of the government, being based on the mistaken idea that the orders made by the Commission in past years can be attacked now, must be rejected because of the failure of their foundations, as well as for the other reasons heretofore stated.

For the foregoing reasons, the judgment of the lower court in Case No. 8995 should be affirmed.

Affirmed.

EDGERTON, Associate Justice (dissenting).

I think it follows from my opinion in Potomac Electric Power Co. v. Public Utilities Commission, —— U.S.App.D.C. ——, 158 F.2d 521, that the District Court erred in dismissing the appeal of the United States.

Though the excessive rates of the past 20 years do not require and would not justify unfairly low rates for the future, history has an important bearing on what is presently fair. The doctrine of Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 31, 46 S.Ct. 363, 366, 70 L.Ed. 808, that rates must provide a return on the "value of the property" even when the property is derived from excessive rates, obviously is not law today, since rates need not now provide a return on the "value of the property" even when the property is *not* derived from excessive rates.

The Washington Railway and Electric Company has always owned the entire common stock of the Company. The excessive rates of the past have enabled the Company to pay to the holding company dividends which have repaid many times over the entire investment in this stock. It does not necessarily follow that all earnings on this stock should cease. That question is for the Commission.[1] The statute we are interpreting limits judicial review to "questions of law" and provides that "findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." (Par. 66) It might be neither arbitrary nor legally erroneous for the Commission in its discretion to fix rates which would produce some return on this stock. But the Commission's discretion has a ceiling as well as a floor. Since rates which produce excessive profits are excessive rates[2] it is arbitrary to find that, despite the Company's financial history, rates are just and reasonable which will allow it to earn in a single year a return upon its common stock equal to more than one-third of the par value of the stock and more than one-half the amount which it received for the stock and invested in plant. Since the Company's surplus is a surplus of excessive returns over excessive dividends it is arbitrary to include this surplus, or any amount beyond what the Company obtained from investors and invested in plant, in a base on which any return is to be allowed. It is an error of law to hold, as the Commission appears to have held, that this must be done. It is an error of law to suppose, as the Commission appears to have supposed, that the Company's rates are approximately low enough because they are lower than they once were and lower than rates still are in many cities. It is an error of law to ignore the interest of the public in low rates. "The rate-making process under the Act, i. e., the fixing of 'just and reasonable'

[1] "Regulation does not insure that the business shall produce net revenues." Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 590, 62 S.Ct. 736, 86 L.Ed. 1037; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L. Ed. 333. Special circumstances may "warrant the rate-making body in concluding that a return on historical cost or prudent investment, though fair to investors, would be grossly unfair to the consumers." But "judicial review * * * should be as confined and restricted as the review, under similar statutes, of orders of other administrative agencies." Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 608, 62 S.Ct. 736, 753, 86 L.Ed. 1037 (Black, Douglas, and Murphy, JJ., concurring).

[2] Dayton-Goose Creek R. Co. v. United States, 263 U.S. 456, 483, 44 S.Ct. 169, 68 L.Ed. 388, 33 A.L.R. 472.

rates, involves a balancing of the investor and the consumer interests." [3] The Commission's order does not balance these interests.

Par. 65 of the statute provides that the District Court, at the conclusion of its hearing of the appeal from the Commission's order, shall either dismiss the appeal and affirm the order or sustain the appeal and vacate the order. But Par. 69 authorizes the Commission to amend its order pending the hearing of the appeal. In my opinion the case should be remanded to the District Court with instructions to hold it until the Commission shall file an amended order within the authority given it by Congress.[4]

[3] Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333.

[4] Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607; 619–623, 64 S.Ct. 1215, 88 L.Ed. 1488, 153 A.L.R. 1007.