**WASHINGTON GAS LIGHT CO. v. BAKER.**

**PUBLIC UTILITIES COMMISSION OF DISTRICT OF COLUMBIA v. BAKER.**

Nos. 10705, 10706.

United States Court of Appeals

District of Columbia Circuit.

Argued Oct. 10, 1950.

Decided Dec. 21, 1950.

Writ of Certiorari Denied March 26, 1951.
See 340 U.S. 952, 71 S.Ct. 571.

Mr. Stoddard M. Stevens, New York City, of the Bar of the Supreme Court of New York *pro hace vice*, by special leave of Court, with whom Messrs. F. G. Awalt and C. Oscar Berry, Washington, D. C., were on the brief, for appellant in No. 10705. Mr. William V. T. Justis, Washington, D. C., also entered an appearance for appellant in No. 10705.

Mr. Lloyd B. Harrison, Special Asst. Corporation Counsel, D. C., Washington, D. C., with whom Mr. Vernon E. West, Corporation Counsel, D. C., Washington, D. C., was on the brief, for appellant in No. 10706. Mr. Edward A. Beard, Asst. Corporation Counsel, Washington, D. C., also entered an appearance for appellant in No. 10706.

Messrs. Herbert P. Leeman and William A. Roberts, Washington, D. C., with whom Mrs. Irene Kennedy and Messrs. Francis J. Ortman and Jerome M. Alper, all of Washington, D. C., were on the brief, for appellee.

Before EDGERTON, BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

Appellee Vernon V. Baker, a consumer of gas distributed by the Washington Gas Light Company, sued in the District Court to set aside a rate increase granted the appellant Company by the appellant Public Utilities Commission of the District of Columbia.[1] The rate increase resulted from a hearing which the Company had requested on the ground that such increase was necessary in order to preserve its financial integrity and to check what it believed to be a decreasing ability to attract capital on favorable terms. This worsening financial position was said to be attributable to rising labor costs which were bringing the Company's net revenues far below what it considered a permissible rate of return. Although the Company urged "emergency" action upon the Commission in the form of authorization of increases sufficient to produce $900,000 in additional revenues, proposed rate schedules were subsequently filed. The proceeding was thereupon adjourned in order to afford the appellee and others the opportunity to prepare their opposition.[2] Numerous parties who are not

---

1. Statutory authority for such a suit is found in 43 D.C.Code § 705 (1940).

2. Although this procedure does not follow precisely the guides laid down in 43 D.C.Code § 401, appellee does not show how he was prejudiced or that he was denied any continuance necessary to the preparation of his case. See Kuhn v.

participants in the court action appeared before the Commission, among them the Federation of Citizens Associations, the General Services Administration, appearing for the United States, the Gas Consumers and Independent Appliance Dealers, etc.

The main item in controversy was the treatment for rate-making purposes of the various problems associated with the conversion of the Company from manufactured to natural gas in 1946-47. The Commission decided that (1) the West Plant, abandoned as a result of the change-over, should remain in the rate base at its full value as of that date—that is, $1,774,666, the original cost less that part of the book reserve for depreciation allocable to it—and charged off as a deduction from operating revenues over a ten-year period; (2) the East Plant, which has been and will be used as a standby plant for manufacturing gas until 1952, should be depreciated at the accelerated rate of about $500,000 a year for ten years so that the unrecovered investment of approximately $5,000,000 would be recovered at the end of that time; (3) the cost of converting customers' appliances so that they could be used for natural gas, amounting to $2,797,589, should be amortized over a ten-year period, the unamortized portion being included in the rate base.[3] Amortization of these various items results in swelling operating revenue deductions almost one million dollars each year for the next ten years. The need for revenues to cover these deductions was in considerable part responsible for the rate increase awarded to the Company by the Commission.

Upon appeal, the District Court awarded appellee Baker the relief requested and ordered "the matter returned to the Public Utilities Commission of the District of Columbia for appropriate proceedings and action * * *." The court below based its order upon the conclusions that it was error of law for the Commission to include abandoned property and conversion costs in the rate base and that the rate increase was improperly retroactive in its effect. It did not disturb Commission treatment of East Plant nor did it find the rates illegally discriminatory. Both the Company and the Commission appealed from the decision of the District Court. Pending disposition of the appeal, this court ordered "the amount hereafter received by the Washington Gas Light Company under the increase" set aside subject to further order of the court.[4]

■ We agree with the District Court that the Commission's order should be vacated and set aside, but our reasons differ materially, as will appear from the detailed discussion below.

Section 43—301 of the District of Columbia Code provides that " * * * The charge made by any * * * public utility for any facility or services furnished, or rendered, or to be furnished or rendered, shall be *reasonable, just, and nondiscriminatory*."[5] This statutory standard, taken together with the limitation of our review to "questions of law" and to findings of fact only if they are "unreasonable, arbitrary, or capricious",[6] invests the District of Columbia Public Utilities Commission with the same broad authority as is possessed by the Federal Power Commission under the Natural Gas Act.[7] The Supreme Court has said that that Commission is "not bound to the use of any single formula or combination of formulae in determining rates", so long as the "total effect," "impact" or "end result" of the rate order "cannot be said to

Civil Aeronautics Board, 1950, 87 U.S. App.D.C. 130, 183 F.2d 839, 841 et seq.

3. The Commission, for accounting purposes only, had already provided for amortization of the unrecovered investment in East and West Plants over a ten-year period. See P.U.C. Order No. 3261 (Sept. 24, 1947).

4. The order was issued on July 5, 1950.

5. Emphasis supplied. 43 D.C.Code § 401 (1940) provides, to the same effect, that "if, after * * * hearing and investigation, the commission shall find that the change or discontinuance [in rates] applied for is reasonable, fair, and just, it shall grant the application, either in whole or in part * * *."

6. 43 D.C.Code § 706 (1940).

7. 15 U.S.C.A. § 717c(a).

be unjust or unreasonable."[8] The limits set by the Court are deliberately broad, resulting both from notions of special competence and the conception of rate-making as a primarily legislative process. So long as the public interest—i. e., that of investors and consumers—is safeguarded, it seems that the Commission may formulate its own standards. But there are limits inherent in the statutory mandate that rates be "reasonable, just, and non-discriminatory." Among those limits are the minimal requirements for protection of investors outlined in the Hope case.[9] And from the earliest cases, the end of public utility regulation has been recognized to be protection of consumers from exorbitant rates.[10] Thus, there is a zone of reasonableness within which rates may properly fall.[11] It is bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates.

## Rate of Return

■■ Despite the broad limits allowed the Commission, it remains imperative that its findings, under whatever formula adopted, be based upon substantial evidence in the record.[12] Here, the Commission adopted the prudent investment theory of rate regulation and, at the hearings and in its Findings and Opinion, used the traditional formula for rate-making. That required a determination of the rate base and of a rate of return on that rate base sufficient to produce adequate revenues above operating expenses (including depreciation) to pay interest on the bonds, dividends on the stock and, in general, maintain the financial integrity of the enterprise.[13] Although the Commis-

8. Federal Power Comm. v. Hope Natural Gas Co., 1944, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333; Federal Power Comm. v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037.

9. 320 U.S. at 603, 44 S.Ct. 281, 88 L.Ed. 333.

10. In addition to the recent exposition of this view in the concurring opinion in the Natural Gas Pipeline case, 315 U.S. at 606–608, 62 S.Ct. 736, 86 L.Ed. 1037, see The Minnesota Rate Cases, (Simpson v. Shepard) 1913, 230 U.S. 352, 454, 33 S.Ct. 729, 762, 57 L.Ed. 1511 ("* * * it is property employed in a public calling, subject to governmental regulation, and while, under the guise of such regulation, it may not be confiscated, it is equally true that there is attached to its use the condition that charges to the public shall not be unreasonable."); San Diego Land Co. v. City of National City, 1899, 174 U.S. 739, 756, 19 S.Ct. 804, 43 L.Ed. 1154; Smyth v. Ames, 1898, 169 U.S. 466, 544–545, 18 S.Ct. 418, 42 L.Ed. 819; Covington &c. Turnpike Co. v. Sandford, 1896, 164 U.S. 578, 596, 17 S.Ct. 198, 41 L.Ed. 560; Chicago & G. T. Railway Co. v. Wellman, 1892, 143 U.S. 339, 345–346, 12 S.Ct. 400, 36 L.Ed. 176; Chicago, M. & St. P. Railway Co. v. State of Minnesota, 1890, 134 U.S. 418, 459, 10 S.Ct. 462, 33 L.Ed. 970 (concurring opinion by Justice Miller).

11. Federal Power Comm. v. Natural Gas Pipeline Co., 315 U.S. at 585–586, 62 S.Ct. 736, 86 L.Ed. 1037.

12. The code provision dealing with procedure on appeal to the District Court from Commission orders states that "The said Court * * * may require and direct the Commission to receive additional evidence *upon any subject related to the issues* on said appeal concerning which evidence was improperly excluded in the hearing before the Commission or *upon which the record may contain no substantial evidence.*" 43 D.C. Code § 705 (1940) [Emphasis supplied].

For cases stating and holding that findings must be based upon evidence in the record, see e.g., Railroad Comm. v. Pacific Gas Co., 1938, 302 U.S. 388, 393, 58 S.Ct. 334, 82 L.Ed. 319; Ohio Bell Telephone Co. v. Public Utilities Comm., 1937, 301 U.S. 292, 300, 306, 57 S.Ct. 724, 81 L.Ed. 1093; West Ohio Gas Co. v. Public Utilities Comm., 1935, 294 U.S. 63, 68, 55 S.Ct. 316, 79 L.Ed. 761; Tagg Bros. v. United States, 1930, 280 U.S. 420, 443, 50 S.Ct. 220, 74 L.Ed. 524; Northern Pacific Ry. Co. v. Department of Public Works, 1925, 268 U.S. 39, 44–45, 45 S.Ct. 412, 69 L.Ed. 836; Florida East Coast Line v. United States, 1914, 234 U.S. 167, 185, 34 S.Ct. 867, 58 L.Ed. 1267; Interstate Commerce Comm. v. Louisville & Nashville R. R., 1913, 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431; Petition of Public Service Coordinated Transport, 1950, 5 N.J. 196, 74 A.2d 580, 593–594.

13. See Colorado Interstate Co. v. Federal Power Comm., 1945, 324 U.S. 581, 601, 605, 65 S.Ct. 829, 89 L.Ed. 1206; Federal Power Comm. v. Hope Natural Gas

sion did make findings as to rate base [14] and estimated operating expenses as well as probable revenues under the rate schedules proposed, it made no inquiry whatsoever into issues necessary to determination of a fair rate of return. Essential to such an inquiry is a study of the capital costs of the business, such as service on the debt and dividends on the stock, in the light of returns on investments in other enterprises having a similar risk factor.[15] Only upon such evidence can the Commission determine what is required "to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." [16] In the Hope case, the Supreme Court makes abundantly clear the nature of the considerations pertinent to that issue.[17]

And, in the 1943 rate proceeding of the Company, the Commission dealt extensively with some of these matters, discussing under "rate of return" facts regarding long-term debt capital, preferred stock capital and common stock capital.[18] It was this sort of inquiry to which the Supreme Court referred when it said that the standard announced in the Hope case is not "so vague and devoid of meaning as to render judicial review a perfunctory process. It is a standard of finance resting on stubborn facts." [19]

The only reference to rate of return in the Commission's opinion is that "a return of less than 4% is obviously inadequate to maintain the Company in a sound financial position." [20] Commission expertise

Co., 320 U.S. at 603, 64 S.Ct. 281, 88 L.Ed. 333; Federal Power Comm. v. Natural Gas Pipeline Co., 315 U.S. at 584, 62 S.Ct. 736, 86 L.Ed. 1037; Brandeis, J., dissenting in Southwestern Bell Telephone Co. v. Public Service Comm., 1923, 262 U.S. 276, 291, 43 S.Ct. 544, 67 L.Ed. 981; Petition of Public Service Coordinated Transport, 5 N.J. 196, 74 A.2d at 590; Graham & Katz, Accounting in Law Practice § 139 (1938); Schapiro & Wienshienk, Cases and Materials on Law and Accounting 466 (1949).

14. See discussion infra 188 F.2d 23.

15. Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 1945, 324 U.S. 635, 649–650, 65 S.Ct. 821, 89 L.Ed. 1241; Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. at 605, 65 S.Ct. 829, 89 L.Ed. 1206; Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. at 603, 64 S.Ct. 281, 88 L.Ed. 333; Brandeis, J., dissenting in Southwestern Bell Telephone Co. v. Public Service Comm., 262 U.S. at 290–291, 43 S.Ct. 544, 547, 67 L.Ed. 981 ("The compensation which the Constitution guarantees an opportunity to earn is the reasonable cost of conducting the business. Cost includes not only operating expenses, but also capital charges. Capital charges cover the allowance, by way of interest, for the use of the capital, whatever the nature of the security issued therefor, the allowance for risk incurred, and enough more to attract capital."); Bluefield Co. v. Public Service Comm., 1923, 262 U.S. 679, 692–693, 43 S.Ct. 675, 679, 67 L.Ed. 1176 ("A rate of return may be reasonable at one time and

become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."); Driscoll v. Edison Co., 1939, 307 U.S. 104, 119–120, 59 S. Ct. 715, 722, 83 L.Ed. 1134. (" * * * each utility presents an individual problem. * * * In this instance, the utility operates in a stable community, accustomed to the use of electricity and close to the capital markets, with funds readily available for secure investment. Long operation and adequate records make forecasts of net operating revenues fairly certain.").

16. Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. at 603, 64 S.Ct. 281, 88 L.Ed. 333.

17. Id., 320 U.S. at 603–605, 64 S.Ct. 281, 88 L.Ed. 333.

18. See pp. 8–18 of the Commission's Order No. 2682 (Nov. 8, 1943).

19. Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. at 605, 65 S.Ct. 829, 840, 89 L.Ed. 1206.

20. The complete reference to this matter was as follows:
" * * * On the basis of income of $1,194,396.11, developed by the Commission's witness, which, with one exception, was found to be proper, a return of 3.70% is indicated. Using the income of $1,106,318 developed by the Company's witness, which for reasons heretofore set forth is understated, a return of 3.43% is indicated. In either case, a return of less than 4% is obviously inadequate to maintain the Company in a sound financial position." [J. A. 102–103]

alone cannot support so pivotal an assumption. Failure to subject this issue to inquiry at the hearing and the consequent inadequacy of the record and the findings render the Commission's conclusion that the rates are "reasonable, just, and non-discriminatory" devoid of substance and wholly ineffective for its purpose.[21] Without any evidence on this essential issue, there is no basis for application of any standard and the judicial review authorized by the statute becomes a formal but futile gesture.

▮▮ Although the Commission's opinion makes no attempt to explain this fatal deficiency in the record, a review of the transcript indicates that the Commission may have based its action on one or both of two possible grounds: (1) That this was an emergency proceeding which relieved the parties from conducting what they referred to as "a full rate hearing" in which proof regarding rate of return would concededly be necessary. While there is no specific statutory provision for such an emergency proceeding, we do not undertake to say whether or under what circumstances the Commission would be warranted in approving rates pursuant to something less than a full rate hearing. The fact is that the Commission here based its ultimate finding that the rates were "reasonable, just, and non-discriminatory" upon a theory of rate-making which clearly requires an inquiry into rate of return. Moreover, it seems to us that if rates were to be granted for emergency purposes in a summary proceeding, provision would have to be made for adjustment of subsequent rates, as under the sliding scale arrangement,[22] if upon a statutory "full rate hearing" it were found that the emergency rates

had produced either excessive or inadequate returns. (2) That the Commission relied upon its finding in some prior proceeding, not specifically referred to, that 6% was a proper rate of return. While under certain circumstances, reliance on a prior proceeding for this purpose might be permissible, such circumstances do not exist in this case. There is nothing before us to indicate that pertinent local conditions and economic conditions generally have remained static during the intervening years. Nor does it appear that the risk factor, so important an element in fixing rate of return, has remained static. On the contrary, it appears to have been materially reduced recently by the change from manufactured to natural gas and by the treatment afforded by the Commission to abandoned plant and standby plant.[23] Finally, the only relatively recent rate proceedings involving this Company[24] dealt with the sliding scale arrangement which presented substantially different considerations.

*Abandoned Property*

The Commission included within the rate base (upon which the Company is entitled to earn a return) the amount of $1,774,666, which represents the original cost of the abandoned West Plant less that part of the book reserve for depreciation said to be allocable to this particular asset. Upon appeal, the District Court held that the valuation sections of the D.C.Code[25] require that only property "used and useful in the public service" be included in the rate base and that inclusion of an abandoned plant was an error of law.

▮ This court has held, however, that the valuation sections of the Code are not binding upon the Commission in rate

21. See statute and cases cited in note 12, supra.

22. Provision is made for a sliding scale arrangement in 43 D.C.Code § 317 (1940). Such an arrangement was in effect for this Company and for the Potomac Electric Power Company for many years. See discussions in Washington Gas Light Co. v. Byrnes, 1943, 78 U.S.App.D.C. 107, 108–109, 137 F.2d 547, 548–549, affirmed 1944, 321 U.S. 489, 64 S.Ct. 731, 88 L.Ed. 883; Potomac Electric Power

Co. v. Public Utilities Comm., 1946, 81 U.S.App.D.C. 225, 226–227, 158 F.2d 521, 522–523, certiorari denied 1947, 331 U.S. 816, 67 S.Ct. 1303, 91 L.Ed. 1834. It is no longer in effect.

23. See discussion infra 188 F.2d 17–22.

24. The most recent of these proceedings was in 1943, at which time 5¾% was found to be a fair rate of return. See Order No. 2682, p. 17.

25. 43 D.C.Code §§ 305, 306 (1940).

proceedings.[26] Thus, the composition of the rate base falls within the province of the Commission under the doctrine of the Hope case. As we interpret that decision, the Commission may adopt any method of valuation for rate base purposes so long as the end result of the rate order "cannot be said to be unjust and unreasonable".[27] It has even been intimated that a commission may use some method of calculating rates other than the traditional one which depends upon the finding of a rate base.[28]

■ With regard to abandoned property, the cases have generally held that a utility was not entitled to a return on property which was no longer "used and useful" in the public service. Since this doctrine originated in cases where the utility challenged rates as confiscatory, the supporting rationale was obvious: the company was entitled to "just compensation" only for property which was "taken" for the public service; it could not expect a return (or compensation) for property which could not and would not be "taken" because it was no longer "used and useful".[29] But as reproduction cost became the favored method for determining rate base,[30] the "used and useful" standard seems to have shifted from its original constitutional basis and become identified instead with this particular method of valuation. Under a reproduction cost theory, it would obviously be unreasonable to burden the public with rates based upon the cost of obsolete and abandoned property which no one would conceivably think of reproducing. This changing emphasis is illustrated by the statement of the Supreme Court in Los Angeles Gas Co. v. Railroad Comm. of California.[31] "Whatever may be said of the propriety of including this entire [abandoned] plant in a valuation based on historical cost, in the light of prudent investment, we perceive no reason for embracing unnecessary facilities in an estimate of cost of reproduction."[32] With the abandon-

26. Potomac Electric Power Co. v. Public Utilities Comm., 81 U.S.App.D.C. at 228–229 and 232, 158 F.2d at 524–525 and 528.

27. 320 U.S. at 602, 64 S.Ct. 281, 88 L. Ed. 333. See our discussion supra, [188 F.2d 15].

28. Colorado Interstate Co. v. Federal Power Comm., 324 U.S. at 601, 610, 65 S.Ct. 829, 89 L.Ed. 1206.

29. The doctrine seems to have arisen in Smyth v. Ames, 1898, 169 U.S. 466, 546, 18 S.Ct. 418, 434, 42 L.Ed. 819, where the Court made the "fair value of the property being used by [the utility] for the convenience of the public" the basis for determining reasonableness of rates. It was subsequently referred to as the governing standard in San Diego Land Co. v. City of National City, 1899, 174 U.S. 739, 757, 19 S.Ct. 804, 43 L.Ed. 1154; San Diego Land & Town Co. v. Jasper, 1903, 189 U.S. 439, 442, 23 S.Ct. 571, 47 L.Ed. 892; The Minnesota Rate Cases, (Simpson v. Shepard) 1913, 230 U.S. 352, 434, 33 S. Ct. 729, 57 L.Ed. 1511; Board of Public Utility Com'rs v. New York Tel. Co., 1926, 271 U.S. 23, 31, 46 S.Ct. 363, 70 L.Ed. 808. But cf. Pacific Gas Co. v. City & County of San Francisco, 1924, 265 U.S. 403, 415–416, 44 S.Ct. 537, 68 L. Ed. 1075.

30. See concurring opinion in the Natural Gas Pipeline case, 315 U.S. at 605–606, 62 S.Ct. 736, 86 L.Ed. 1037.

31. 1933, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180.

32. Id., 289 U.S. at 311, 53 S.Ct. at 646, See United Gas Co. v. Texas, 1938, 303 U.S. 123, 144, 58 S.Ct. 483, 82 L.Ed. 702; Himes v. Pennsylvania Power & Light Co., 16 P.U.R.,N.S., 65, 83–85 (Pa. P.S.C., 1936). Note also the Supreme Court's statement in Market Street R. Co. v. Railroad Comm., 1945, 324 U.S. 548, 567, 65 S.Ct. 770, 89 L.Ed. 1171.

Without analyzing rate cases in detail, it may be safely generalized that the due process clause never has been held by this Court to require a commission to fix rates on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the value no longer to exist, or on an investment after it has vanished, even if once prudently made, or to maintain the credit of a concern whose securities already are impaired. The due process clause has been applied to prevent governmental destruction of existing economic values. [Emphasis supplied.]

ment of the eminent domain analogy in the Hope case and the adoption of the view that rate-making is but one species of price-fixing which, like other action pursuant to the police power, may validly "reduce the value of the property which is being regulated."[33] the constitutional basis for "used and useful" was swept away.

Here, the Commission adopted the prudent investment theory of rate base valuation rather than the reproduction cost method. Appraisal of the former theory reveals that the "used and useful" standard is no necessary part of it. Primary emphasis is now being placed not on "specific property, tangible and intangible," but on capital prudently invested and embarked on an enterprise in the public service.[34] Under the view taken by the Commission, the theory contemplates that rates will enable the investor to maintain his original prudent investment intact until it is recovered through annual charges to depreciation expense, which are reflected in a reserve for depreciation.[35] If a unit of property resulting from prudent investment becomes obsolete before it has been recovered in full by the investor (either through annual depreciation charges or through returns sufficient to compensate for such inadequacy),[36] it is not necessarily erroneous as a matter of law for the Commission to include it in the rate base until such recovery has occurred. Such a course may be necessary in order to assure efficiency and progress in the art and the continued attraction of capital to the enterprise.

But inclusion in the rate base must meet the test of justness and reasonableness to the consumer as well as to the investor. As we have indicated, the rate of return to which the investor is entitled is measured in part by the risks of the business as compared with those of comparable enterprises.[37] It thus becomes relevant to determine whether or not investors have, during the useful life of this property, been compensated for assuming the risk that it would become inadequate or obsolete before the investment in it was entirely recovered.[38] Such compensation may have

---

33. 320 U.S. at 601, 64 S.Ct. 281, 88 L. Ed. 333.

34. Brandeis, J., dissenting in Southwestern Tel. Co. v. Public Service Comm., 262 U.S. at 290, 43 S.Ct. 544, 67 L Ed. 981.

35. Brandeis, J., dissenting in United Railways v. West, 1930, 280 U.S. 234, 279, 50 S.Ct. 123, 74 L.Ed. 390, and in Pacific Gas Co. v. City & County of San Francisco, 1924, 265 U.S. 403, 424-425, 44 S.Ct. 537, 68 L.Ed. 1075. For discussion of depreciation, see Lindheimer v. Illinois Bell Tel. Co., 1934, 292 U.S. 151, 167 et seq., 54 S.Ct. 658, 78 L.Ed. 1182 ("Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. * * * In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered. The amount necessary to be provided annually for this purpose is the subject of estimate and computation." Id., 292 U.S. at 167, 54 S.Ct. at page 664; Knoxville v. Knoxville Water Co., 1909, 212 U.S. 1, 13 et seq., 29 S.Ct. 148, 53 L.Ed. 371; Wisconsin Public Service Commission, Depreciation, A Review of Legal and Accounting Problems (1933); Freeman, Public Utility Depreciation, 32 Corn.L. Q. 4 (1946).

36. See discussion infra 188 F.2d 20, and note 39.

37. See cases cited in note 15 supra.

38. Brandeis, J., dissenting in Pacific Gas Co. v. City & County San Francisco, 265 U.S. at 419, 44 S.Ct. 537, 541, 68 L. Ed. 1075 ("Whether a return of 7 per cent. is the proper test of a compensatory rate must, obviously, depend in part upon whether the return includes any of the risk of obsolescence."). One writer has observed that "Since one of the major 'risks' of utilities is functional depreciation [or obsolescence], and compensation for risk is one of the recognized components of a fair return, if allowance is made for this 'risk' as part of a rate of return and also as a depreciation expense, the consumer is twice charged. * * * a public utility, to the extent that it is permitted a functional depreciation, has relieved itself of a major risk and a lower rate of return

been made either through inclusion of obsolescence (1) as one of the elements used in calculating depreciation expense, or (2) as a risk considered in fixing the permissible rate of return.[39] If, in the past, the risk of obsolescence was provided for in either of these two ways, then the abandoned property should not be included in the rate base today. If it were, then the investor would be paid for the occurrence of the very eventuality the risk of which he had been consciously carrying and for which he had already been paid. The effect upon the consumer would be the same as if an insured person were required to assume the loss against which he believed himself protected by payment of premiums. The result would clearly violate the consumer interest against "exorbitant" rates.

■■ It is not for us to say, in the present state of the record, whether or not the risk of obsolescence, in the sense we use the phrase, was borne by the investor in the past and whether he was compensated for it. That is an inquiry which must be made in the first instance by the Commission. It seems likely, however, in view of the prevalence in the past of the doctrine that abandoned property would not be included in the rate base (regardless of whether depreciation accruals had resulted in complete recovery to the investor), that investors have been compensated for the risk of obsolescence.

■■ Briefly, then, our view is that the Commission may depart from the "used and useful" standard if it takes into account the extent to which the risk that this particular plant would become obsolete was borne by investors in the past and the extent to which they were compensated for it. So far as the future is concerned, elimination of the risk of obsolescence will require that the rate of return allowed the Company be lower than one which compensates for such risk. Rate payers cannot be required both to carry this risk and to pay the Company for carrying it. Although we think the Hope doctrine precludes us from forbidding the Commission to include abandoned property in the rate base, we are convinced that protection of the consumer interest requires that such treatment of abandoned property be offset in the rate of return.

*Depreciation*

Even if the Commission ultimately concludes that the unrecovered value of the abandoned property may be included in the rate base, there is some question as to what that amount should be. Appellee challenged the Commission's deduction from the value of the abandoned plant of an allocable portion of the book reserve for depreciation rather than of the larger actual depreciation as measured by the straight-line method and represented by the reserve requirement.[40]

should accordingly be allowed." Freeman, supra note 35, at 9–10. The same writer describes obsolescence or functional depreciation as "one of the major risks of business" and refers to an estimate by a leading writer on the subject that "utility retirement [is] 80 per cent functional." Id. at 9.

39. Freeman, supra note 35, at 9, points out that it was at one time customary for utilities to ignore estimates of obsolescence in determining the extent of annual charges to depreciation expense. If that was the practice here in the District of Columbia, it seems likely that during such period as the practice prevailed, the investor was compensated for assuming the risk of obsolescence by being awarded a higher rate of return on his investment. If, subsequently, estimates of obsolescence were included in

calculating depreciation expense (and hence provided for in advance), the risk of obsolescence may have been to that extent eliminated as a risk of the business and may no longer have been reflected in the rate of return. But even if obsolescence was ultimately taken into account as indicated, there remained another risk, which would also appear to have been a proper element in calculating rate of return: the risk that at the time of retirement of obsolete property, the reserve for depreciation established by the annual charges to depreciation expense would be inadequate (because of errors in estimates of service-life, etc.) to cover so large an amount. This last risk was accentuated by the prevalence of the "used and useful" standard which made abandonment the cut-off point after which obsolete property could no longer be included in the rate-base.

The Commission based its action upon the conclusion that while ordinarily retired property should be written off against the book reserve for depreciation, the annual charges to depreciation during most of the life of this property were too low and hence, deduction of that amount would leave the reserve dangerously low; that since depreciation rates were fixed or approved by the Commission, the Company's investors should not bear the loss resulting from the present inadequacy of the book reserves for this purpose. The Commission's conclusion depends upon the premise that the inadequate charges for depreciation in the past resulted in lower revenues to investors than they would otherwise have received; that since such lower revenues were suffered, it would be inequitable for investors to bear the burden a second time by, for example, charging the undepreciated amount to earned surplus.[41] Despite this premise, the record contains no evidence as to whether earnings during the life of this property sufficiently exceeded the fair rate of return to compensate investors for the inadequate depreciation charges.[42] We recognize that the legality of past rates may not be challenged, and that past excessive earnings belong to the Company just as past losses must be borne by it.[43] That is not to say,

however, that when the Commission purports to act on the equities of the situation, and awards higher rates because of past inequities to investors, it must not support the factual premise upon which it builds by evidence in the record. "Elaborate calculations which are at war with realities are of no avail."[44] If the factual premise is true, that is, if past earnings were not sufficient to compensate investors for inadequate depreciation charges, then the Commission may properly require the burden to be borne by consumers or to be shared by investors and consumers depending upon the circumstances.

## The Standby Plant

We do not disturb the Commission's classification of East Plant as a standby plant until 1952, the date presently fixed for its retirement. Such a determination depends upon estimates best made by those most familiar with the situation, i. e., the capacity of the main plant, emergency needs, population growth, etc.

We do think, however, that the Commission's treatment of East Plant for rate base and depreciation purposes is affected by what we have said above about the West Plant. Although East Plant is not yet completely obsolete (as is West Plant), the conversion to natural gas has made its

40. The reserve requirement, i. e., the amount which *should* be in the reserve for depreciation in order to accurately measure the exhaustion of service life of the property to date, was determined by the Commission after a study which culminated in Order No. 3487, Feb. 3, 1949. For a discussion of the various considerations involved in deduction of book reserve versus deduction of reserve requirement, see Lippitt, *Net Investment Rate Making—The Deduction for Depreciation*, 62 Harv.L.Rev. 1155 (1949); Freeman, supra note 35, at 19-20; Wisconsin Public Service Commission, op. cit., supra note 35, at 62-67, 147 et seq.

41. That such a charge to surplus is one method of handling such contingencies is indicated by Cook, Abandoned Property and the Rate Base, 17 Acc'ting Rev. 243, 246 (1942). For a discussion of various factors making different action desirable, see Nash, Anatomy of Depreciation, 173-176 (1947); Graham, Public Utility Valuation, 31-32, 38-39 (1934).

42. In Commissioner Hankin's dissent from the 1943 order, Order No. 2682 (Nov. 8, 1943), there is considerable reference and detail with regard to the earnings history of this company. See also Judge Edgerton's discussion of a similar financial history in Potomac Electric Power Co. v. Public Utilities Comm., 1946, 81 U.S.App.D.C. 225, 158 F.2d 521.

43. United States v. Public Utilities Comm., 1946, 81 U.S.App.D.C. 237, 241–242, 158 F.2d 533, 537–538; Federal Power Comm. v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 590, 62 S.Ct. 736, 86 L.Ed. 1037; Board of Public Utility Comm. v. New York Tel. Co., 1926, 271 U.S. 23, 31–32, 46 S.Ct. 363, 70 L.Ed. 808.

44. Lindheimer v. Illinois Bell Tel. Co., 1934, 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182.

retirement imminent. For that reason, the Commission has treated East Plant in an extraordinary fashion, separating it from the rest of the corporate property for depreciation purposes and depreciating it at an accelerated rate, viz., about $500,000 a year for ten years. Whether or not such a distortion of operating revenue deductions is permissible depends upon the same sort of inquiry as was found to be necessary in connection with West Plant.

■ So far as the amount, (i. e., the present depreciated original cost of East Plant) which is being subjected to the accelerated depreciation rates is concerned, that is said to reflect inadequate charges to depreciation expense in the past. What we have said in this regard in connection with West Plant applies here too.[45] And whatever the figure adopted by the Commission after assessment of the factors we have held to be relevant, there still remains the determination of whether or not investors have already been compensated for the risk that annual depreciation charges would prove inadequate at the time of retirement, because of obsolescence.[46] But for the extraordinary treatment accorded this property by the Commission, East Plant would face exactly the same problem two years from now as does West Plant at present. Detection of imminent obsolescence before it becomes an actuality does not relieve the Commission of the obligation to protect consumers from what may be payments for things already paid for.

*Conversion Costs*

■ As an incident of the change-over from manufactured to natural gas in 1946-47, it was necessary to adapt all of the customers' appliances so that they could receive the new fuel. This involved an expenditure by the Company of approximately $3,000,000. That this would be a proper item of expense currently deductible from operating revenues is not disputed here. And since such a large deduction within

so short a period would unduly distort the revenue requirements of the Company, it was reasonable to treat the matter as one of deferred expense allocable over a period of future years. We cannot say that the period of ten years adopted by the Commission for that purpose is improper or unsupported by the record.

Appellee, however, challenges the Commission action allowing the unamortized portion of the conversion costs to be included in the rate base and a return allowed thereon. In addition to arguing that this expenditure represents a prudent investment, the Company seeks to justify such treatment by contending that if it had not converted to natural gas, about $8,000,000—reflecting capital for construction of needed additional manufactured gas facilities—would have had to be added to the rate base. It concluded that by choosing the less-expensive alternative, there was a substantial benefit to the consumer. It seems glaringly apparent to us, however, that the other alternative would have been grossly uneconomic and would have entailed considerable risk for the investor. For without the substitution of the less-costly and more efficient natural gas for manufactured gas, the probability of successful competition with electric power and other fuels would have been greatly diminished. As a matter of fact, the position of the investor has not only been greatly improved with respect to the future but the change-over has served to shore the foundation of his investment. Obviously, the conversion resulted in benefits to the investor as well as to the consumer.

■ But, consistent with the doctrine enunciated by the Supreme Court with respect to the scope of our review,[47] we are of the opinion that it is for the Commission to determine whether or not this extraordinary expenditure, even though not reflected in tangible property additions to the Company's plant, should be considered a prudent investment includible in the rate base.[48] In

45. See discussion supra 188 F.2d 20.
46. See discussion supra 188 F.2d 19.
47. See 188 F.2d 22, supra.

48. "The thing devoted by the investor to the public use is not specific property, tangible and intangible, but capital embarked in the enterprise." Brandeis, J.,

our view, such matters may no longer be determined as a matter of law but must depend upon the Commission's appraisal of how the interests of investor and consumer ought best to be balanced.

*Rate Base*

Since the District Court order setting aside the rate increase is being affirmed on other grounds, there is no need to discuss whether or not the Commission's finding as to rate base is adequately supported by evidence in the record. We do wish to point out, however, that an examination of the transcript of record leaves some doubt as to whether the basic valuation figure, of which the present rate base is said to be a projection, represents original cost, reproduction cost, or some other "fair value" figure. Nor is the basic valuation order specifically referred to in the Commission's Findings and Opinion. In addition, we cannot find assembled in any one place a description of net additions since the original figure was adopted. For example, we are referred to a series of proceedings under the sliding scale and, in effect, are asked to make our own calculations.

██ We think the Commission should keep in mind its obligation to facilitate judicial review of its orders and should assemble a record and make findings which cover all the relevant issues. Unless the Commission tells us what "formula or for-

mulae" it has chosen and makes clear the evidentiary support for its findings under whatever formula adopted, we are handicapped in applying even the limited judicial review left us by the Hope case.

*Other Problems*

A number of other objections to the Commission's order were raised by appellee in the court below. Among them are the questions whether or not the rate schedules ultimately approved discriminate between domestic and industrial users, whether the rate increase is illegally retroactive, etc. Because of our disposition of the case, we do not deem it necessary to consider these problems at this time.

We hold that the Commission's order is invalid because of the inadequacy of the record and findings with regard to rate of return, abandoned property and the standby plant. We do not disturb the Commission's treatment of conversion costs, but with respect to that and to rate base, we have raised considerations which should be weighed in any further proceedings.

The order of the District Court is affirmed. The funds resulting from the rate increases granted by the Commission, which were ordered to be held in a separate fund by this court pending disposition of the appeal, will be distributed to rate-payers.

Affirmed.

dissenting in Southwestern Bell Tel. Co. v. Public Service Comm., 262 U.S. at 290, 43 S.Ct. at 547, 67 L.Ed. 981;

"If a new device is adopted which involves additional investment (to buy a new plant or a patent right) the company's investment, on which the return must be paid, is increased by that amount. If the new device does not involve new investment, but the innovation involves increased current payments (like royalties for use of a process) the additional disbursement is borne by the community as an operating expense." Brandeis, J., dissenting in Pacific Gas Co. v. City & County of San Francisco, 265 U.S. at 425, 44 S.Ct. at 543, 68 L.Ed. 1075.