### AT & T INFORMATION SYSTEMS, INC., Petitioner,

v.

### FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

North American Telecommunications Ass'n, Mountain States Telephone and Telegraph Co., et al., B. South Corp., AT & T Information Systems, Inc., Southwestern Bell Telephone Co., Ameritech Operating Companies, ROLM Corp., New York Telephone Co., et al., Pacific Bell and Nevada Bell, Bell Atlantic Telephone Companies, NYNEX, South Central Bell Telephone Co., et al., Intervenors.

No. 85–1198.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1987.

Decided Aug. 30, 1988.

Jules M. Perlberg, Chicago, Ill., with whom Jonathan S. Hoak and Ronald S. Flagg, Washington, D.C., were on the brief, for petitioner. James A. Debois, Berkeley Heights, N.J., also entered an appearance for petitioner.

Linda L. Oliver, Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Robert B. Nicholson and Andrea Limmer, Attys., U.S. Dept., of Justice, and John E. Ingle, Counsel, F.C.C., Washington, D.C., were on the brief, for respondents. Catherine G. O'Sullivan, Atty., U.S. Dept. of Justice, and Jane E. Mago, Counsel, F.C.C., Washington, D.C., also entered appearances for respondents.

R. Frost Branon, Jr., Atlanta, Ga., (for BellSouth Corp., et al.), Alfred Winchell Whittaker, Washington, D.C., and Floyd S. Keene, Milwaukee, Wis., (for Ameritech Telephone Companies), Mark J. Mathis, James R. Young, Washington, D.C., and Lawrence W. Katz, Prescott, Ariz., (for Bell Atlantic Telephone Companies), Saul Fisher, Bedminster, N.J., and Martin J. Sil-

verman, Washington, D.C., (for NYNEX Companies), William C. Sullivan, Topeka, Kan., and Keith E. Davis, St. Louis, Mo., (for Southwestern Bell Telephone Co.), Robert B. McKenna, Jr., Denver, Colo., and Dana A. Rasmussen, Washington, D.C., (for Mountain States Telephone & Telegraph Co., et al.), and Robert L. Barada, Margaret deB. Brown, Susan E. Barisone, and Stanley J. Moore, San Francisco, Cal., (for Pacific Bell and Nevada Bell) were on the joint brief for intervenors.

Linda S. Legg and Mary W. Marks, St. Louis, Mo., entered appearances for intervenor Southwestern Bell Telephone Co.; Norman C. Frost, Birmingham, Ala., entered an appearance for intervenor BellSouth Corp.; Thomas J. Reimar entered an appearance for intervenor Ameritech Operating Companies; John B. Messenger, Boston, Mass., entered an appearance for intervenor New York Telephone Co.; Thomas L. Welch, Philadelphia, Pa., entered an appearance for intervenor Bell Atlantic Telephone Companies; Albert H. Kramer and Denise C. Bonn, Washington, D.C., entered appearances for intervenor North American Telecommunications Association; and Mary Jo Manning, Washington, D.C., entered an appearance for intervenor ROLM Corp.

Before WALD, Chief Judge, and BORK * and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

AT & T Information Systems petitions for review of a Federal Communications Commission order requiring it to reimburse the cost of refurbishing certain equipment transferred to it as a result of the court-ordered breakup of American Telephone and Telegraph Company. As we find the FCC's actions inadequately explained and inconsistent with case law, we grant the petition and remand to the agency for reexamination.

---

* Circuit Judge Bork was a member of this panel but did not participate in this decision.

## I. BACKGROUND

### A. Legal Framework

*Federal Power Commission v. Hope Natural Gas*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and its progeny, establish certain fundamental principles governing the fixing of rates by federally regulated public utilities. That case holds that in order to ascertain what rates are just and reasonable, there must be

> a balancing of the investor and the consumer interests.... From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. *Cf. Chicago and Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345–346 [12 S.Ct. 400, 402, 36 L.Ed. 176] [ (1893) ]. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks.

320 U.S. at 603, 64 S.Ct. at 288.

Because rates reflect, in part, the costs of the property employed in a utility's operations, ratepayers and investors alike have an interest, though a competing one, in the valuation placed on any assets removed from the regulated rate base and on the allocation of any profits that may be derived therefrom. A regulatory agency, and any court reviewing an agency's action, must therefore examine and balance these interests with care whenever a regulated utility disposes of such property.

In *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 485 F.2d 786 (D.C.Cir.1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974) (*"Democratic Central"*), we addressed this balance by identifying "the principles which must guide the allocation, as between investor and consumer groups, of appreciation in value of utility assets while in operating status." *Id.* at 806. The first of these holds "that the right to capital gains on utility assets is tied to the risk of capital losses." *Id.* In situations where it is difficult to ascertain who bears the risk of loss, however, the second principle comes into play, namely, "that those who bear the financial burden of particular utility activity should also reap the benefits resulting therefrom." *Id.* at 808.

As we pointed out in *Democratic Central*, ratepayers generally assume the risk of loss on depreciable assets used in a utility's operations because the investors are protected against loss by the depreciation expenses incorporated in the rates charged by the utility. Thus it is "generally agree[d] that customers have the superior claim to capital gains achieved on depreciable assets while in operation. *Id.* at 811. As the assets at issue in *Democratic Central* consisted of real estate comprised of depreciable improvements located on non-depreciable parcels of land, and as the trend in land values in the District of Columbia was such as to preclude any realistic risk of loss on the value of the land, the first test was found to be inappropriate. *Id.* Having found the first test inapplicable, the court applied the second: Because the ratepayers had borne all the burdens incidental to preserving the real estate, they were entitled to the profits realized on its sale. *Id.* at 821–22.

### B. The Dispute

This dispute concerns customer premises equipment ("CPE"), such as telephone headsets and switching systems used by large corporate customers. Prior to the early 1980's, the AT & T's Bell System telephone operating companies ("BOCs") would lease most of the CPE to their customers for use on their own premises. CPE costs, including the costs of refurbishment that extended its useful life, were included in the regulated rate base and recovered by investors through annual depreciation charges.

By the early 1980's, many other companies began to manufacture CPE for sale directly to customers. The FCC determined that the BOCs should be allowed to compete on the open market for CPE sales or leases. Consequently, the FCC removed CPE from the regulated rate base for telephone services provided by BOCs. Proce-

dures for Implementing the Detariffing of Customer Premises Equipment and Enhanced Services (Second Computer Inquiry), 95 F.C.C.2d 1276, 1298–99 ¶ 34 (1983) (*"Computer II Procedures"*), *modified in part, Reconsideration Order,* 50 Fed.Reg. 9016 (1985).

The settlement of the long-lived AT & T antitrust suit complicated matters for the FCC. *See United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd mem. sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). In that case, the court grouped the BOCs into regional entities, which would in turn be separated from the parent company. Of more importance to the FCC's plans, the court required that the BOCs transfer their CPE to AT & T. 552 F.Supp. at 192 & n. 248. In preparation for the transfer, AT & T created AT & T Information Systems ("ATT–IS"), a new subsidiary, to serve as the recipient of the deregulated CPE. The court did not mandate CPE detariffing, as that issue was pending before the FCC. *Id.* at 203 n. 303.

In detariffing the CPE (i.e., removing it from the rate base), the FCC examined the respective interests of ratepayers and investors in the equipment and sought to accommodate them by devising a plan having the stated objective of giving ratepayers "an opportunity to capture gains in the value of assets" by allowing them to purchase in-place CPE at net book value, "while investors are given an opportunity to recoup their investment" through the flexibility granted ATT–IS in certain areas of pricing and valuation. *Computer II Procedures,* 95 F.C.C.2d at 1319 ¶ 66.

The FCC chose to accomplish the deregulation of CPE in concert with the court-ordered breakup of the Bell System, which took effect on January 1, 1984. *Computer II Procedures,* 95 F.C.C.2d at 1281–83 ¶¶ 5–6. CPE was categorized as either "new" or "embedded," depending on whether it had been purchased or manufactured before or after January 1, 1983. As new CPE had been removed from the regulatory rate base, only embedded CPE remained to be detariffed upon AT & T's

breakup. This included all CPE in existence prior to 1983 and in use by Bell System customers or in the Bell System inventory.

To carry out the detariffing of embedded CPE, the FCC had to assign it an economic value that would be subtracted from the rate base at the time of detariffing. Because the CPE was comprised of literally millions of disparate items, the Commission decided that the only feasible approach was to rely on net book value (defined as original cost less related depreciation reserve) as the proxy for the aggregate economic value of the equipment being removed from the rate base. *Computer II Procedures,* 95 F.C.C.2d at 1306–10 & n. 40.

At the time of its removal from the rate base, the embedded CPE fell into three categories. "In-place CPE" consisted of equipment actually in use by customers at the date of transfer. CPE that had been removed from a customer's premises for refurbishment as it was approaching the end of its initial useful life (usually about five years) was designated "inventory CPE." This dispute concerns "refurbished inventory CPE," namely, CPE still in inventory whose refurbishment had been completed prior to transfer (refurbishment takes several months on average and generally adds another five years to the equipment's useful life).

The FCC directed the transfer of all embedded CPE to ATT–IS as of January 1, 1984, the date the breakup of AT & T took effect. To ensure protection of the ratepayers' interests in the transferred equipment, the FCC required ATT–IS to offer for sale all in-place CPE to current users during the two years following reorganization. ATT–IS undertook to base the sale price for each type of in-place CPE on net book value, with certain adjustments to reflect tax effects and transaction costs. *Id.* at 1320 ¶ 67. This allowed current ratepayer/users to recover the excess, if any, of the market value above net book value. ATT–IS was required to submit monthly reports of its revenues from the mandatory sales and to relate those revenues to the total net book value of in-place CPE. Mon-

itoring the relationship between sales revenues and reductions in aggregate net book value for in-place CPE would enable the FCC to impose corrective measures as required. *Id.* at 1321–22 ¶ 70, 1339 at ¶ 99. Neither refurbished inventory CPE nor inventory CPE was subject to similar mandatory sale programs.

ATT–IS was at liberty to sell the refurbished inventory CPE on the market without the pricing restraints applied to the sale of in-place CPE. To prevent ATT–IS from capturing gains resulting from the refurbishment paid for by the BOCs, the FCC ordered ATT–IS to reimburse those costs. As the BOCs continued to provide regulated service after the breakup of AT & T, these reimbursements would be credited by the BOCs to their rate base accounts, thereby reducing rates to the ratepayers who had originally paid for the refurbishment.

ATT–IS objects that the special treatment accorded refurbished inventory CPE represents an unwarranted departure from the rationale governing the other categories of embedded CPE. Because the prospective costs of refurbishment and the resulting extension in the useful life of the refurbished equipment had been reflected in the depreciable expenses charged to ratepayers, the addition of the reimbursed refurbishment costs to net book value represented an unexplained departure from the use of net book value as a surrogate for economic value. Brief for Petitioner at 19.

Under the original detariffing order, the FCC assumed, for purposes of simplicity, that 100 percent of the refurbishment costs incurred by the BOCs in 1983 was attributable to the embedded CPE inventory transferred to ATT–IS in 1984. Because, under this premise, the refurbishment completed during 1983 would contribute to the value of that inventory, and because the FCC proceeded on the admittedly arbitrary assumption that the expenditures would "create a value of precisely one year's duration," it required ATT–IS to reimburse the BOCs for fifty percent of the total refurbishment expenses incurred in 1983. *Com-*

*puter II Procedures,* 95 F.C.C.2d at 1388 ¶¶ 201, 203. Upon reconsideration after the transfer took place, ATT–IS persuaded the FCC to change the calculations because not all of the CPE refurbished by the BOCs in 1983 was transferred to ATT–IS, and only sixty percent of the inventory CPE that was transferred had been fully refurbished. The FCC decided, however, that ATT–IS should reimburse the BOCs for the *full* refurbishment costs associated with the sixty percent of inventory that had been refurbished. *Reconsideration Order,* 50 Fed.Reg. at 9030 ¶¶ 74 & 77. ATT–IS estimates that the resulting charge will impose on its investors an obligation amounting to "tens of millions of dollars." Brief for Petitioner at 22 n. 29.

ATT–IS petitioned for review, claiming that the refurbishment charge violates the tenets of *Hope Natural Gas* and *Democratic Central.* Its principal complaint is that the FCC's order tips the scales in favor of ratepayers by failing to protect the investors against losses from the resale of refurbished inventory CPE while allowing the ratepayers, through the refurbishment charge paid the BOCs, to capture gains in excess of the real value of the refurbished CPE.

## II. Discussion

The FCC's imposition of a refurbishment charge lacks sufficient support in the record and in its *Reconsideration Order.* The FCC's decision to use net book value as the proxy for aggregate economic value of all the embedded CPE provided an acceptable—and accepted—basis for the detariffing process. 95 F.C.C.2d at 1306 ¶ 45, 1308 ¶ 49. This approach recognized that the net book values assigned many CPE items would inevitably understate their economic value while the net book values of others would just as surely overstate them. Nevertheless, the FCC expected that these differences would tend to average out, and the use of the net book value approach would prove the fairest feasible way to protect the interests of both investors and ratepayers.

When dealing with refurbished inventory CPE, the Commission abandoned the averaging principle that had guided its treatment of the other categories of embedded CPE. The FCC proceeded on an apparent but undocumented premise that fully refurbished inventory CPE would have an economic value at least equal to its net book value. On any resale of refurbished inventory, the FCC assumed ATT–IS would be able to recapture the net book value of the CPE, which included the reimbursed refurbishment costs.

The FCC appears to have made no allowance for the fact that given today's rapid changes in telephone technology, obsolescence and other factors could reduce the resale value of fully refurbished equipment to well below its net book value. In such instances, ATT–IS will suffer twofold. It will have been required to reimburse ratepayers for refurbishment costs whose addition to real value is speculative, and it is exposed to a risk of loss it can no longer transfer to ratepayers in the form of depreciation charges.

The FCC may have overlooked the potential losses to investors that could result from its refurbished inventory CPE directive because of the manner in which it applied *Democratic Central.* Instead of observing the distinctions between the two principles enunciated in that case and the sequence in which they were applied in determining which of the competing interests were entitled to benefit from gains realized on properties removed from a utility's rate base, the Commission appears to have placed the principles in a blender and emerged with an amalgam it describes as follows:

> [T]he rule announced in that case [*Democratic Central Committee*] is that neither the investors nor the ratepayers have a vested right to the gains from the sale of appreciated utility property. Rather, our task in this matter is properly to balance the investor and ratepayer interests so as to apportion gains and losses in the most equitable manner. *American Telephone and Telegraph Co., Charges for Interstate Telephone Service,* Docket No. 19129, Phase II, Final Decision, 64 F.C.C.2d 1, 66 (1977). *Computer II Procedures* at 1314–15 (bracketed language in original).

Thus the Commission substitutes a generalized invocation of equity for the specific methodology by which the court in *Democratic Central* determined where the equities lie.

Specifically, *Democratic Central* requires that the "risk-of-loss" principle be applied to the determination of whether investors or ratepayers should receive the proceeds at issue; and only if that first principle proves inapplicable may the second, "burdens-benefits" principle, be invoked. Had the FCC followed that methodology in this case, it would have had to take cognizance of the fact that as a consequence of its directive, investors (as represented by ATT–IS) were being required to assume the risk of loss on the incremental investment in inventoried CPE resulting from its refurbishment. The FCC's analysis, however, is silent on this most basic element in determining where the balance of investor and ratepayer interests lies.

We do not conclude that the treatment of refurbished inventory CPE set forth by the Commission in its *Reconsideration Order* is necessarily indefensible; merely that the Commission has failed to defend it.

### III. CONCLUSION

The failure of the FCC to offer reasoned support for its assumption that the market value of refurbished inventory CPE at least equalled its net book value dooms that portion of the plan as arbitrary. It is inconsistent with the assumptions the FCC made concerning the other categories of embedded CPE and fails to consider the possibility of investors' losses as required by *Democratic Central.* Accordingly, ATT–IS's petition for review is

GRANTED.