SOUTHWESTERN BELL
CORPORATION,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Ameritech Operating Companies, et al.,
Bell Atlantic Telephone Companies,
American Telephone and Telegraph
Company, United States Telephone As-
sociation, National Association of Reg-
ulatory Commissioners, U.S. West, Inc.,
GTE Telephone Operating Companies,
Western Union Corporation, Centel
Corporation, National Cable Television
Association, Independent Data Commu-
nications Manufacturers Association,
North American Telecommunications
Association, New York Telephone Com-
pany, et al., BellSouth Corporation, et
al., International Business Machines
Corporation, Contel Corporation, State
of Michigan, et al., Ad Hoc Telecommu-
nications Users Committee, Inter-
venors.

GTE SERVICE CORPORATION, et
al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Ameritech Operating Companies, et al.,
American Telephone and Telegraph
Company, United States Telephone As-
sociation, United Telephone System
Companies, BellSouth Corporation,
Bell Atlantic Telephone Companies,

New York Telephone Company, et al.,
Contel Corporation, U.S. West, Inc., Pa-
cific Telesis Group, et al., International
Business Machines Corporation, Ad
Hoc Telecommunications Users Com-
mittee.

Nos. 87–1764, 89–1020.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1990.

Decided March 2, 1990.

Dan T. Foley, with whom James D. Ellis,
Liam S. Coonan, James S. Golden, Paul G.
Lane, St. Louis, Mo., and Alfred Winchell
Whittaker (for Southwestern Bell Corp.),
and Richard McKenna and James R. Hob-
son (for GTE Service Corporation, et al.),
were on the joint brief, for petitioners. Ed-
gar Mayfield, William C. Sullivan, St.
Louis, Mo., Melanie S. Fannin, Austin, Tex.,
and Michael A. Meyer, St. Louis, Mo., also

entered appearances for petitioner Southwestern Bell Corp.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Diane S. Killory, Linda L. Oliver and Laurel R. Bergold, Counsel, F.C.C., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Arthur H. Simms and Peter G. Wolfe (for Western Union Corp.), Theodore D. Frank, Washington, D.C. (for Centel Corp.), Brenda L. Fox, Michael S. Schooler and David L. Nicoll, Washington, D.C. (for Nat. Cable Television Ass'n), Herbert E. Marks and James L. Casserly, Washington, D.C. (for Independent Data Communications Mfrs. Ass'n), Albert H. Kramer and Robert F. Aldrich, Washington, D.C. (for North American Telecommunications Ass'n), Saul Fisher, Mary McDermott and Martin J. Silverman, New York City (for New York Telephone Co., et al.), William B. Barfield and R. Frost Branon, Jr., Atlanta, Ga., (for BellSouth Corp., et al.), J. Roger Wollenberg, William T. Lake, John H. Harwood, II, Washington, D.C. and Kevin H. Cassidy, Purchase, N.Y. (for Intern. Business Machines Corp.), John Wohlstetter, Washington, D.C. (for Contel Corp.), Frank J. Kelley, Louis J. Caruso and Don L. Keskey, Lansing, Mich. (for State of Mich., et al.), James S. Blaszak and Charles C. Hunter, Washington, D.C., (for Ad Hoc Telecommunications Users Committee), Floyd S. Keene and Alfred Winchell Whittaker (for Ameritech Operating Companies, et al.), James R. Young, Thomas L. Welch and David K. Hall, Washington, D.C. (for Bell Atlantic Telephone Companies), Francine J. Berry and Marc E. Manly, Washington, D.C. (for American Tel. & Tel. Co.), Martin T. McCue (for U.S. Telephone Ass'n), Paul Rodgers and Charles D. Gray, Washington, D.C. (for Nat. Ass'n of Regulatory Utility Com'rs), Dana A. Rasmussen, Robert B. McKenna and Debra T. Yarbrough, Wash-

ington, D.C. (for U.S. West, Inc.), James R. Hobson and Richard McKenna (for GTE Telephone Operating Companies), James P. Tuthill, Lucille M. Mates and Stanley J. Moore, San Francisco, Cal., (for Pacific Telesis Group, et al.), entered appearances for intervenors.

Carolyn C. Hill, James T. Roche, Washington, D.C., and J. Richard Devlin entered appearances for intervenor United Telephone System Companies in No. 89–1020.

Before WALD, Chief Judge, EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Southwestern Bell Corporation ("Southwestern") and GTE Service Corporation ("GTE") petition this court to review Federal Communication Commission ("FCC") rules governing the transfer of assets between a regulated telephone company and its nonregulated affiliates. Petitioners challenge these rules as arbitrary and capricious and contrary to our precedents. We conclude that the FCC adopted measures reasonably designed to prevent systematic abuse of ratepayers and therefore deny the petition for review.

I.

In recent years, telephone companies have significantly diversified their businesses to envelop nonregulated activities. Since the companies' permitted rate of return on telephone service depends upon the relevant cost of providing those regulated services, the FCC must properly allocate costs between the regulated and nonregulated businesses. Diversified telephone companies possess a natural incentive to shift costs to their regulated telephone service, and thereby guarantee the recovery of those costs from ratepayers. The FCC's responsibility under the Communications Act is to prevent prices for regulated telephone services from incorporating the costs of nonregulated activities and thus to en-

sure that telephone rates are "just and reasonable." 47 U.S.C. § 201(b).

The risk of cost misallocation is magnified when regulated telephone companies engage in transactions with their nonregulated affiliates. As with any parent-subsidiary relationship, the parties may not conduct the purchase or sale of assets in an arms-length fashion. The telephone company may attempt to purchase assets at inflated prices and then recoup the excessive cost through the resulting increase in the cost-based rate of return; meanwhile, the nonregulated affiliate would profit from the windfall price paid. Similarly, when selling an asset to a nonregulated affiliate, the telephone company has an incentive to sell at an artificially low price and then let any loss fall ultimately on its ratepayers.

To avoid this kind of abuse of the regulatory regime, the FCC at first demanded total structural separation of regulated and nonregulated businesses. The Commission, however, later abandoned this approach in favor of nonstructural, accounting regulations designed to allocate joint costs among the two lines of businesses. In 1987, the FCC adopted rules governing the transfer of assets between a regulated telephone company and its nonregulated affiliates. *See Separation of Costs of Regulated Telephone Service from Costs of Nonregulated Activities*, 2 FCC Rcd 1298 (1987) (*"Joint Cost Order"*); 47 C.F.R. § 32.27.[1] Under these regulations, the regulated company must record the transaction with its nonregulated affiliates at market price if that is the "prevailing price held out to the general public." 47 C.F.R. § 32.27(b) and (c). If a prevailing price cannot be determined, the FCC will treat a transaction differently depending upon whether the regulated company is a purchaser or seller. If the company buys an asset from a nonregulated affiliate, the carrier must record its purchase on its books as the *lesser* of the asset's fair market value or net book cost. *See* 47 C.F.R. § 32.27(b). On the other hand, if the com-

pany sells an asset, it must record the sale on its books as the *greater* of fair market value or net book cost. *See* 47 C.F.R. § 32.27(c). These accounting rules are intended to discourage inflation of the regulated company's ratebase by less than arms-length transactions. In unusual circumstances, the carrier may seek a waiver of these rules from the FCC. *See Joint Cost Order*, 2 FCC Rcd at 1336.

II.

Petitioners assert that the only rational accounting rule would require the recording at market price of both transfers into and out from regulation. The *Joint Cost Order*, they contend, imposes an arbitrary and capricious discrimination against a regulated carrier's investors by treating sales and purchases differently and will eventually harm rather than protect ratepayers. Second, petitioners argue that our prior decisions in *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 158 U.S.App.D.C. 7, 485 F.2d 786 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974) (*"Democratic Central Committee"*), and *AT & T Information Sys., Inc. v. FCC*, 272 U.S.App. D.C. 225, 854 F.2d 1442 (1988) ("AT & T–IS"), preclude the FCC's "double standard" accounting scheme. We conclude that both contentions are wide of the mark.

As we noted, the FCC regulations permit sales and purchases by regulated carriers to be recorded at market price when the company deals with unaffiliated third parties or if a prevailing price exists for the asset when it deals with an affiliate. Thus, Southwestern and GTE's complaint actually focuses on the "residual" situation in which the carrier sells or purchases from its affiliate an asset for which no discernable market price exists. That narrow circumstance is precisely when the risk of abusive cost misallocation is greatest. Courts have long recognized that intracompany buyers and sellers may not deal with

---

1. The *Joint Cost Order* also applies to internal transfers of assets between a company's regulat-

ed and nonregulated accounts.

each other at arms-length, *see, e.g., AT & T v. United States*, 299 U.S. 232, 239, 57 S.Ct. 170, 173, 81 L.Ed. 142 (1936), and that strong incentives exist for carriers to channel their nonregulated costs into regulated telephone services, *see, e.g., United States v. Western Elec. Co.*, 673 F.Supp. 525, 553–54 & n. 124 (D.D.C.1987).

While petitioners admit that affiliate transactions call for "heightened regulatory scrutiny," they insist that other more finely tailored means of regulatory oversight would sufficiently protect against possible cost misallocation. Even a cursory glance of the regulatory history of telephone companies, however, exposes the fallacy of this premise. Before its breakup, AT & T wholly owned the Bell Operating Companies ("BOCs"). The BOCs, in turn, purchased most of their telecommunications equipment from Western Electric Company, an affiliate of AT & T. The FCC discovered that the intracompany nature of the purchase and sale of equipment created a built-in bias in favor of dealing with affiliates. *See AT & T Co.*, 64 FCC 2d 1, 41 (1977). And in its antitrust case against AT & T, the government alleged that the BOCs had purchased equipment at inflated prices from Western Electric to shift costs to the telephone services. In response, the settlement decree required a structural separation of the BOCs from Western Electric, along with a prohibition against the BOCs entering certain markets like telephone equipment manufacturing.[2] *See United States v. AT & T*, 552 F.Supp. 131, 190–91 (D.D.C.1982), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

Based on its past experience in regulating intracompany asset transfers and the complexity of these transactions, the FCC could reasonably conclude that these accounting rules were necessary to brake the carriers' potential for abuse. As the agency charged with the duty and possessed of the expertise to regulate telephone service, the FCC is entitled to deference as to its choice of regulatory techniques. *See Illinois Bell Tel. Co. v. FCC*, 883 F.2d 104, 108–09 (D.C.Cir.1989). The Commission "may adopt any method of valuation for rate base purposes so long as the end result of the rate order cannot be said to be unjust or unreasonable." *NEPCO Mun. Rate Comm. v. FERC*, 215 U.S.App.D.C. 295, 668 F.2d 1327, 1333 (1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982) (quoting *Washington Gas Light Co. v. Baker*, 88 U.S.App.D.C. 115, 188 F.2d 11 (1950)).

Southwestern and GTE even claim that the FCC's rules will hurt *ratepayers* by discouraging advantageous intracompany transactions. The FCC, however, expects the residual rule to apply "in a limited number of cases" since a prevailing price will exist in most instances. *See Reconsideration Order*, 2 FCC Rcd 6283, 6296 (1987). To the extent the accounting rules might prevent certain transactions favorable to ratepayers, the FCC was entitled to conclude that "on balance, prevention of cost shifting is the more important goal." *Id.*[3]

We find equally unpersuasive petitioners' argument that *Democratic Central Committee* and *AT & T-IS* require an invalidation of the FCC's accounting rules. Neither case addressed an attempt to minimize the risk of cost misallocation in complex, ongoing affiliate transactions. In *Democratic Central Committee*, we decided that since ratepayers had borne the economic burden of preserving real estate owned by the public transit utility, they were also entitled to reap the profits on the sale of the land. *See Democratic Central Committee*, 485 F.2d at 821–22. We further enunciated the general principle that "the

---

**2.** In an appeal pending before this court from the first triennial review of that decree in which the BOCs seek removal of those restrictions, they strongly argue that the district court erred in not deferring to the FCC's regulatory efforts to prevent cross-subsidization. Petitioners' position here may not be strictly inconsistent, but it borders on "chutzpah." *See Northwest Airlines,* *Inc. v. Air Line Pilots Ass'n Int'l*, 808 F.2d 76, 83 (D.C.Cir.1987).

**3.** We note in passing that the affiliate transaction rule obtained the support of state regulatory agencies. *See Joint Cost Order*, 2 FCC Rcd at 1335, 1356 n. 450.

right to capital gains on utility assets is tied to the risk of capital losses." *Id.* at 806. But *Democratic Central Committee* addressed neither the plasticity of valuation nor the incentive to mold values to circumvent a regulatory scheme, the twin problems which the accounting rule attempts to address. The link between the right to receive capital gains and the risk of losses is still preserved under the FCC rule in transactions with nonaffiliates (the situation present in *Democratic Central Committee*) and also with affiliates when a prevailing price for the transferred asset exists.

In *AT & T–IS*, we applied *Democratic Central Committee*'s "risk of loss" principle in concluding that the FCC had inadequately supported its directive that AT & T reimburse the cost of refurbishing customer premises equipment after the breakup of AT & T. We concluded that AT & T rather than the BOC ratepayers had borne the risk of loss if the equipment could only be sold below the net book cost. *See AT & T–IS*, 854 F.2d at 1447. But in *AT & T–IS*, we only confronted a one-time need equitably to allocate gains on the sale of the customer premises equipment in the wake of the AT & T breakup. The FCC accounting regulation, in contrast, represents a prophylactic rule designed to curb abuses in ongoing affiliate transactions. The Commission rule is a response to systematic incentives to shift costs through less than arms-length deals. Going forward, then, the FCC may seek to avoid the threat of cost misallocation with disincentives built into the accounting rules.

\*     \*     \*     \*     \*     \*

We conclude that the FCC's accounting rules for affiliate transactions are reasonable and consistent with our prior decisions. Accordingly, the petition for review is denied.

*It is so ordered.*